**No. 22-2552**

# In the United States Court of Appeals
# For the Third Circuit

ROBERT MATOR; NANCY MATOR,
Individually and as representatives of a class of participants and beneficiaries in and on behalf of WESCO Distribution, Inc. Retirement Savings Plan,
*Plaintiffs-Appellants*,

v.

WESCO Distribution, Inc., The Administrative and Investment Committee for WESCO Distribution Inc. Retirement Savings Plan; John and Jane Does 1-3,
*Defendants-Appellees*

On appeal from the United States District Court
for the Western District of Pennsylvania,
Case No. 2:21-cv-00403

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

Steven A. Schwartz, Esquire
steveschwartz@chimicles.com
Beena M. McDonald, Esquire
bmm@chimicles.com
CHIMICLES SCHWARTZ KRINER
  & DONALDSON-SMITH LLP
361 W. Lancaster Avenue
Haverford, PA  19041
Phone:  (610) 642-8500

Paul R. Wood, Esquire
woodp@fdazar.com
Timothy L. Foster, Esquire
fostert@fdazar.com
FRANKLIN D. AZAR
  & ASSOCIATES, P.C.
14426 E. Evans Avenue
Aurora, CO  80015
Phone:  (303) 757-3300

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUE.............................................................2

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................2

STATEMENT OF THE CASE.............................................................3

I.     Statutory Background ......................................................3

II.    Plaintiffs' Claims .........................................................4

       A.    Excessive Recordkeeping Fees ...........................................6

       B.    Higher-Cost Share Classes of Investment Options .............................9

III.   Procedural History .........................................................10

SUMMARY OF THE ARGUMENT ......................................................12

STANDARD OF REVIEW .............................................................18

ARGUMENT .......................................................................20

I.     The District Court Erred In Dismissing The Second
       Amended Complaint By Applying An Improper Standard
       Of Review To A Rule 12(b)(6) Motion To Dismiss ...................................20

II.    Plaintiffs' Plausibly Alleged Defendants Breached Their
       Fiduciary Duties By Imprudently Providing Higher-Cost Share
       Classes of Funds When Identical Lower-Cost Share Classes
       Were Available ............................................................22

III.   Plaintiffs' Plausibly Alleged Defendants Breached Their
       Fiduciary Duties By Imprudently Incurring Excessive
       Recordkeeping Fees.........................................................33

IV.   Plaintiffs' Plausibly Alleged Defendants Breached Their
      Fiduciary Duties By Imprudently Failing to Monitor the Plan's
      Recordkeeping Fees and to Investigate Lower-Cost
      Share Class Options .........................................................................48

CONCLUSION ......................................................................................50

# TABLE OF AUTHORITIES

## CASES

*Albert v. OshKosh*,
    47 F.4th 540 (7th Cir. 2022) ...............................................................32

*Allison v. L Brands, Inc.*,
    2021 U.S. Dist. LEXIS 35551 (S.D. Ohio 2021) ..............................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................13, 18, 19, 20

*Bagic v. Univ. of Pittsburgh*,
    773 Fed. Appx. 84 (3d Cir. June 11, 2019) .......................................48

*Bangalore v. Froedtert Health*,
    No. 2:20-cv-00893-PP, 2022 U.S. Dist. LEXIS 13864 (E.D. Wis.
    Jan. 26, 2022)......................................................................................16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................18, 19, 20, 44

*Boley v. Universal Health Servs., Inc.*,
    498 F. Supp. 3d 715 (E.D. Pa. 2020).................................................16

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) .............................................................14

*Cannon v. MBNA Corp.*,
    2007 U.S. Dist. LEXIS 48901 (D. Del. 2007)...................................16

*Carrigan v. Xerox Corp.*,
    No. 3:21-cv-1085 (SVN), 2022 U.S. Dist. LEXIS 70428 (D. Conn.
    Apr. 18, 2022).....................................................................................15

*Cassell v. Vanderbilt Univ.*,
    285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ..........................................16

*Cates v. Trs. of Columbia Univ. in City of New York*,
    2017 U.S. Dist. LEXIS 138330 (S.D.N.Y. 2017)..............................16

*Clark v. Duke Univ.*,
   2017 U.S. Dist. LEXIS 164370 (M.D.N.C. 2017) .............................................16

*Connelly v. Lane Const. Corp.*,
   809 F.3d 780 (3d Cir. 2016) ......................................................................21, 41

*Cunningham v. Cornell Univ.*,
   2017 U.S. Dist. LEXIS 162420 (S.D.N.Y. 2017)............................................16

*Daugherty v. Univ. of Chicago*,
   2017 U.S. Dist. LEXIS 155948 (N.D. Ill. 2017) .............................................16

*Davis v. Magna Int'l. of Am., Inc.*,
   2021 U.S. Dist. LEXIS 62106 (E.D. Mich. Mar. 31, 2021)..............................43

*Davis v. Salesforce*,
   No. 21-1587, 2022 U.S. App. LEXIS 9527 (9th Cir. 2022)..................15, 30, 50

*Davis v. Wash. Univ. in St. Louis*,
   960 F.3d 478 (8th Cir. 2020) ....................................................................17, 32

*Divane v. Northwestern Univ.*,
   953 F.3d 980 (7th Cir. 2020), *vacated and remanded, ex. rel.*
   *Hughes v. Northwestern University*, 142 S. Ct. 737 (2022) ..............................10

*Falberg v. Goldman Sachs Grp., Inc.*,
   2020 U.S. Dist. LEXIS 121457 (S.D.N.Y. 2020)............................................16

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014)......................................................................................3

*Foglia v. Renal Ventures Mgmt., LLC*,
   754 F.3d 153 (3d Cir. 2014) ..........................................................................21

*Forman v. TriHealth*,
   40 F.4th 443 (6th Cir. 2022) ....................................................................31, 32

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ...............................................................13, 18, 21

*Goodman v. Columbus Reg'l. Healthcare Sys.*,
   4:21-cv-15 (CDL), 2022 U.S. Dist. LEXIS 13489 (M.D. Ga. Jan.
   25, 2022) ......................................................................................................16

iv

*Hay v. Gucci Am., Inc.*,
2018 U.S. Dist. LEXIS 171193 (D.N.J. 2018) ..................................................16

*Henderson v. Emory Univ.*,
252 F. Supp. 3d 1344 (N.D. Ga. 2017) ...............................................................16

*Hughes v. Northwestern Univ.*,
142 S. Ct. 737 (2022) ..................................................................................*passim*

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
2:20-cv-01493 No. 1-10, 2022 U.S. Dist. LEXIS 60711 (W.D. Pa.
Mar. 31, 2022) .............................................................................................*passim*

*Johnson v. PNC Fin. Servs. Grp., Inc.*,
2:20-CV-01493-CCW, 2021 U.S. Dist. LEXIS 149408 (W.D. Pa.
Aug. 3, 2021), *dismissed in part*, 2022 U.S. Dist. LEXIS 60711
(W.D. Pa. Mar. 31, 2022) .............................................................................*passim*

*Kelly v. Johns Hopkins Univ.*,
2017 U.S. Dist. LEXIS 161547(D. Md. 2017), *recons. denied*,
2018 U.S. Dist. LEXIS 137634 (D. Md. 2018) ..................................................16

*Kong v. Trader Joe's Co.*,
2020 U.S. Dist. LEXIS 224835 (C. D. Cal., Nov. 30, 2020) .............................30

*Kong v. Trader Joe's Co.*,
No. 20-56415, 2022 U.S. App. LEXIS 10323 (9th Cir. 2022).........15, 29, 30, 50

*Lauderdale v. NFP Ret., Inc.*,
No. 8:21-cv-00301-JVS-KES, 2022 U.S. Dist. LEXIS 26397 (C.D.
Cal. Feb. 8, 2022) .............................................................................................15

*Lutz v. Kaleida Health*,
2019 U.S. Dist. LEXIS 130513 (W.D.N.Y. 2019) .............................................16

*In re M&T Bank Corp.*,
2018 U.S. Dist. LEXIS 154641 (W.D.N.Y. 2018) .............................................16

*Matousek v. MidAmerican Energy Co.*,
751 F.4th 274 (2022) .........................................................................................43

*Nicolas v. Trs. of Princeton Univ.*,
2017 U.S. Dist. LEXIS 151775 (D.N.J. 2017) ...........................................16, 44

*Perez v. WPN Corp.*,
No. 14-1494, 2017 U.S. Dist. LEXIS 87530 (W.D. Pa. June 7,
2017) ..................................................................................................48, 50

*Perkins v. United Surgical Partners Int'l Inc.*,
2022 WL 824839 (N.D. Tex. Mar. 18, 2022).....................................42

*Perrone v. Johnson & Johnson*,
48 F.4th 166 (3d Cir. 2022) ...............................................................18

*Peterson v. Ins. Servs. Office, Inc.*,
2021 U.S. Dist. LEXIS 70877 (D.N.J. 2021) .....................................16

*Pinnell v. Teva Pharms. USA, Inc.*,
No. 19-cv-5738, 2020 U.S. Dist. LEXIS 55617 (E.D. Pa. Mar. 31,
2020) ..............................................................................................39, 45

*In re Quest Diagnostics Inc. ERISA Litig.*,
2021 U.S. Dist. LEXIS 85722 (D.N.J. 2021) .....................................16

*Reichert v. Jupiter Networks, Inc.*,
No. 21-cv-06213-JD, 2022 U.S. Dist. LEXIS 76599 (N.D. Cal.
Apr. 27, 2022) .....................................................................................15

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011) .........................................................18, 19

*Riley v. Olin Corp.*,
2022 WL 2208953 (E.D. Mo. June 21, 2022) ...............................42, 43

*Sacerdote v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) ................*passim*

*Savage v. Sutherland Glob. Servs., Inc.*,
521 F. Supp. 3d 308 (W.D.N.Y. 2021)...............................................16

*Serv. Emps. Int'l Union, Dist. 1199P v. Monsour Med. Ctr., Inc.*,
555 F. Supp. 2d 566 (W.D. Pa. 2008)..................................................16

*Shaw v. Quad/Graphics, Inc.*,
No. 2:20-cv-01645-PP, 2022 U.S. Dist. LEXIS 13861 (E.D. Wis.
Jan 26, 2022).......................................................................................16

*Silva v. Evonik Corp.*,
No. 20-cv-2202, 2020 U.S. Dist. LEXIS 250206 (D.N.J. Dec. 30, 2020) ............................................................................................. 31

*Singer v. Barnabas Health, Inc.*,
2021 U.S. Dist. LEXIS 72282 (D.N.J. 2021) .................................... 16

*Smith v. CommonSpirit Health*,
2022 U.S. App. LEXIS 17043 (6th Cir. 2022) ................................... 32

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) .......................................................... 42

*Smith v. CommonSpirit Health*,
No. 2:20-cv-95 (E.D. Ky. Jul. 2, 20220) ........................................ 32

*Smith v. Shoe Show, Inc.*,
No. 1:20-cv-00813-WO-JEP, 2022 U.S. Dist. LEXIS 33823
(M.D.N.C. Feb. 25, 2022) ............................................................... 15

*Smith v. VCA, Inc.*,
No. 21-cv-9140-GW-AGRx, 2022 U.S. Dist. LEXIS 103585 (C.D. Cal. Apr. 6, 2022) ......................................................................... 15

*Sweda v. Univ. of Pa.*,
923 F.3d 320 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020)............*passim*

*Tibble v. Edison Int'l.*,
2017 U.S. Dist. LEXIS 130806 (C.D. Cal. Aug. 16, 2017) .............. 29

*Tibble v. Edison Int'l*,
575 U.S. 523 (2015).........................................................................*passim*

*Tibble v. Edison Int'l*,
843 F.3d 1187 (9th Cir. 2016) ......................................................... 28

*Tracey v. MIT*,
2017 U.S. Dist. LEXIS 165070 (D. Mass. 2017) .............................. 16

*Turpin v. Duke Energy Corp.*,
2021 U.S Dist. LEXIS 40457 (W.D.N.C. Mar. 4, 2021) ................... 16

*Vellali v. Yale Univ.*,
    308 F. Supp. 3d 673 (D. Conn. 2018) .................................................16

*White v. Chevron Corp.*,
    No. 16-0793, 2017 U.S. Dist. LEXIS (N.D. Cal. May 31, 2017),
    *aff'd*, 752 Fed. Appx. 453 (9th Cir. 2018) .........................................30

## **STATUTES**

28 U.S.C. §1291 .............................................................................................1

28 U.S.C. §1331 .............................................................................................1

29 U.S.C. § 1001(b) .......................................................................................3

29 U.S.C. § 1024(b)(4) .................................................................................46

29 U.S.C. § 1104(a)(1) ...................................................................................3

29 U.S.C. § 1104(a)(1)(A) .............................................................................4

29 U.S.C. § 1104(a)(1)(B) .............................................................................3

29 U.S.C. § 1109(a) ........................................................................................4

29 U.S.C. § 1132(a) ........................................................................................4

29 U.S.C. §1132(a)(2) ......................................................................1, 4, 9, 10

29 U.S.C. §1132(e)(1) and (f) ........................................................................1

## **OTHER AUTHORITIES**

Fed. R. App. P. 4(a)(1)(A) .............................................................................1

Fed. R. Civ. P. 8(a)(2) ..................................................................................18

Fed. R. Civ. P. 12(b)(6) ..........................................................................*passim*

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1) and (f), as a matter arising under the Employee Retirement Income Security Act of 1974 ("ERISA") pursuant to 29 U.S.C. §1132(a)(2).

This Court has appellate jurisdiction under 28 U.S.C. §1291, as an appeal from the district court's judgment entered on August 18, 2022.[1] Plaintiffs-Appellants filed a timely notice of appeal on August 22, 2022 pursuant to FED. R. APP. P. 4(a)(1)(A).

---

[1] This appeal is based upon the district court's Opinion (Appx0005-Appx25) and Order (Appx0004) granting Defendants' motion to dismiss Plaintiffs' Second Amended Complaint, entered on August 18, 2022, which references and is based upon the underlying record in the case, including the district court's Opinion and Order (Appx0026-Appx0044) granting Defendants' motion to dismiss Plaintiffs' Amended Complaint, entered on April 7, 2022, and the district court's Opinion and Order (Appx0045-Appx0060) granting Defendants' motion to dismiss the Complaint, entered on October 4, 2021. Citations to "Appx." refer to the Appendices attached to this brief.

## STATEMENT OF THE ISSUE

Whether Plaintiffs' Second Amended Complaint states plausible claims for breach of ERISA's fiduciary duty of prudence upon which relief can be granted, where Plaintiffs allege that the Defendants caused the Wesco Distribution, Inc. Retirement Savings defined contribution plan to lose millions of dollars in retirement savings by:

- selecting and retaining far higher-cost share classes of 19 mutual funds in the Plan instead of otherwise *identical* lower-cost share classes of those same funds; and

- allowing the Plan's recordkeeper to receive compensation more than 4 times higher than the market rate for the same services.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously. Plaintiffs-Appellants are aware of no other case or proceeding that is in any way related to this appeal.

## STATEMENT OF THE CASE

## I.     Statutory background

Congress enacted ERISA for the express purpose of protecting "the interests of participants in employee benefit plans and their beneficiaries, … by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). The statute imposes upon plan fiduciaries "strict standards of trustee conduct . . . derived from the common law of trusts," including "a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416, 419 (2014) (citations omitted). ERISA's duty of prudence provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

ERISA fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). Fiduciaries must discharge their duties "for the exclusive purpose of

3

providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

Fiduciaries who breach their ERISA-imposed duties "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach[.]" 29 U.S.C. § 1109(a). Any breaching fiduciary will also "be subject to such other equitable or remedial relief as the court may deem appropriate[.]" *Id.* ERISA provides a mechanism for civil enforcement by participants and beneficiaries of employee benefit plans. 29 U.S.C. § 1132(a). Participants and beneficiaries of a plan may bring a civil action for relief. 29 U.S.C. § 1132(a)(2).

## II.    Plaintiffs' Claims

Plaintiffs-Appellants ("Plaintiffs") are current participants in the Wesco Distribution, Inc. Retirement Savings Plan ("Plan"), a qualified tax-deferred, defined contribution retirement plan. (Appx2111 ¶ 7; Appx2113 ¶ 19; Appx2114 ¶ 24; Appx2117 ¶ 33.) With $837 million in assets and 8,284 participants as of December 31, 2020, the Plan is larger than 99.60% of defined contributions plans in number of participants and larger than 99.83% in terms of assets. (Appx2111 ¶ 7.) Plans with such substantial assets have significant bargaining power and ability to demand low-cost administrative and investment management services. (Appx2111 ¶ 9; Appx2120 ¶ 44; Appx2123 ¶ 51; Appx2125-2127 ¶¶ 54-60; Appx2130 ¶ 72.)

Wesco Distribution, Inc. ("Wesco") is the Plan sponsor and a fiduciary charged with administering the Plan. (Appx2111¶ 8; Appx2116 ¶ 29.) Wesco assembled the Plan's Administrative and Investment Committee ("Committee") and appointed its members, all of whom are also Plan fiduciaries, to administer the Plan on its behalf. (Appx2111 ¶ 8; Appx2116 ¶¶ 29-30.) From at least 2009 through June 30, 2020, Defendants-Appellants ("Defendants") contracted with Wells Fargo Bank, N.A. ("Wells Fargo") to serve as the Plan's recordkeeper providing services typical to any large defined contribution plan, including responsibility for maintaining records of Plan participants' accounts, transaction processing, and performing various administrative functions such as providing quarterly participant statements and Plan disclosures. (Appx2136-2137 ¶¶ 93-94.)

Plaintiffs allege that Defendants breached their fiduciary duties owed to the Plan, to Plaintiffs, and all other Plan participants by imprudently: (a) allowing unreasonable recordkeeping and administrative ("Recordkeeping") expenses to be charged to the Plan; and (b) selecting, retaining, and/or otherwise ratifying higher-cost share classes (*i.e.,* retail share classes) instead of offering more prudent alternative lower cost share classes (*i.e*., institutional share classes) of the same mutual funds when such more prudent share classes were readily available at the time they were chosen for inclusion with in the Plan and throughout the Class Period. (Appx2112 ¶ 12.) Instead of leveraging the Plan's substantial bargaining power to

limit expenses, Defendants caused the Plan to imprudently pay unreasonable and excessive Recordkeeping fees and retail share class fees for Retirement Plan Services, which reduced Plan participants' account balances and caused Plan participants to lose out on substantial investment returns. (Appx2112-2113 ¶¶ 11, 13; Appx2149 ¶ 119; Appx2154 ¶ 138.)

### A.    Excessive Recordkeeping Fees

Plaintiffs allege that the Recordkeeping fees paid to Wells Fargo were approximately four times the amount of a reasonable fee. (Appx2137-2148 ¶¶ 95-115.) The Plan paid Wells Fargo an average of $154 per participant per year in total Recordkeeping services fees, when a reasonable fee would have been approximately $42 per participant. (Appx2141 ¶102; Appx2143 ¶ 106; Appx2146-2147 ¶¶ 110, 112). Plaintiffs identify *five* examples of plans, comparable in number of plan participants and assets, that also use Wells Fargo as a recordkeeper, but were charged far lower total per-participant Recordkeeping fees by Wells Fargo. (Appx2141¶ 102). Plaintiffs further identify *eleven* other plans, with comparable numbers of plan participants and assets, that use other top retirement service providers, but pay far lower total per-participant Recordkeeping fees. (Appx2143 ¶ 106.) These other top retirement services providers, "Fidelity, Vanguard, T. Rowe Price, Voya, and Transamerica," were direct competitors of Wells Fargo, providing services for defined contribution plans with assets in excess of $200 million. (Appx2144-2145

¶¶ 107, 108.) Due to the "highly competitive" market (Appx2125 ¶¶ 55, 56), these top recordkeepers would have offered "the same or substantially similar services to those offered by Wells Fargo" and vigorously competed for the Plans' business (Appx2144-2145 ¶¶ 107, 108).

Plaintiffs also cite publications by the United States Department of Labor and experts in retirement plan design explaining that retirement plans can achieve lower costs and greater efficiency by benchmarking and monitoring fees and negotiating competitive pricing. (Appx2132 ¶¶ 77-78; Appx2134-2137 ¶¶ 85-92, Appx2146 ¶ 111.) Defendants, however, failed to take these steps that would have reduced the Plans' recordkeeping fees. (Appx2148-2150 ¶¶ 115-128.)

Defendants caused Plan participants to pay Wells Fargo both direct and indirect recordkeeping fees. (Appx2137 ¶ 96.) In order to determine the amount of direct and indirect fees paid by the Plan, Plaintiffs' reviewed the Plan's Form 5500s filed with the U.S. Department of Labor, the accompanying financial notes, publicly available revenue sharing rates, as well as the exhibits relied upon by Defendants in their motion to dismiss. (Appx2112 ¶ 15; Appx2138-2140 ¶¶ 97-99.) Direct Recordkeeping fees were calculated based on a percentage of a participant's account balance, and were paid directly from the participants' accounts (Appx2138 ¶ 97). Indirect Recordkeeping fees were calculated based on a percentage of the year-end assets for each investment option, and were paid through revenue sharing

(Appx2139 ¶ 98; Appx2141-2142 ¶¶ 102-103). Plan participants paid total fees (direct and indirect) that averaged $153 per participant per year during the Class period. (Appx2138-2140 ¶¶ 97-99.) Defendants failed to negotiate a per-participant cap for the Recordkeeping fees and failed to require that Wells Fargo rebate excessive fees to Plan participants. (Appx2138-2139 ¶¶ 97, 98; Appx2149 ¶ 120.) Defendants further failed to conduct a Request for Proposals ("RFP") from 2009 through 2019 to determine if another recordkeeper could provide more competitive rates for Recordkeeping services. (Appx2149-2150 ¶¶ 122, 126.)

The Plan paid an average of $153 per participant in total Recordkeeping fees when a reasonable fee would have been $42 per participant. (Appx2146-2147 ¶¶ 110, 112.) Plaintiffs identified *five* comparable defined contribution plans that also used Wells Fargo as their Recordkeeping service provider, but paid Wells Fargo almost four times less in total fees than the total fees Wells Fargo charged the Plan. (Appx2141-2142 ¶¶ 102-104.) Plaintiffs further identified an additional *eleven* comparable plans that used other top Recordkeeping service providers, which also reflect that the Plan paid Wells Fargo approximately four times the reasonable per-participant amount than what these other providers charged for the same services. (Appx2136-2137 ¶¶ 93, 94; Appx2141 ¶ 102; Appx2143 ¶¶ 105, 106; Appx2145-2148 ¶¶ 108, 109, 110, 112 117.) The validity of Plaintiffs' comparisons is confirmed by retirement consulting group NEPC, whose 2019 Defined

Contributions Progress Report found the range of total Recordkeeping fees for comparably sized plans was between $40 and $60 per participant. (Appx2147 ¶ 113.) Wells Fargo did not offer any Recordkeeping services to the Plan that were so unique or of such markedly higher quality so as to justify paying such excessive fees. (Appx2146 ¶ 111.) The imprudence of allowing the Plan to pay unreasonable and excessive Recordkeeping fees for six years cost Plan participants millions in lost retirement savings. (Appx2149 ¶ 119.)

In 2020, the Plan switched from Wells Fargo to Fidelity as its recordkeeper and negotiated a total fee $53 per-participant for the same services provide by Wells Fargo. (Appx2112 ¶ 15, fn. 4; Appx2147 ¶ 114.) Had Fidelity offered lesser services to the Plan participants, Defendants would be duty-bound as fiduciaries to communicate the same to participants. (*Id.*) No such communications to Plan participants were made, thereby confirming that the services offered by Fidelity are materially identical to those offered by Wells Fargo. (*Id.*)

### B.    Higher-Cost Share Classes of Investment Options

Plaintiffs allege that Defendants breached their fiduciary duties by imprudently selecting and retaining nineteen higher-cost retail share classes of investment options with revenue sharing, when lower-cost institutional share classes of the identical mutual funds were available to the Plan. (Appx2152-2155 ¶¶ 132, 133, 137; Appx2155 ¶ 139.) Yet, these more expensive share classes do not offer the

potential for higher returns – in fact, as disclosed in the prospectuses of the various funds, all of the institutional class shares outperformed the higher cost alternatives primarily by the difference in the operating expenses. (Appx2155 ¶ 139.)  Further, all fund share classes are publicly traded, and the risk factors are the same for all share classes. (*Id.*)  Moreover, the use of higher-cost share classes was not necessary to defray the cost of already excessive Recordkeeping fees. (*Id.*) Because the share classes have identical portfolio managers, underlying investments, and asset allocations, but differ only in cost, the failure to select the lower-cost share classes demonstrates that Defendants acted imprudently. (Appx2155 ¶¶ 140-142.) This imprudent share class retention cost Plan participants between $700,000 and $900,000 per year in excessive investment management costs. (Appx2154 ¶ 138.)

### III.   Procedural History

Plaintiffs filed an initial Complaint on March 26, 2021. (Appx0073-0113.) In response, Defendants filed a Rule 12(b)(6) motion to dismiss on June 17. (Appx0114-0710.)[2] Plaintiffs filed an opposition to the motion to dismiss on August 2. (Appx0711-0739.) Defendants filed a reply brief on August 16. (Appx0740-

---

[2] In the interim, on July 14, Defendants filed a motion to stay the proceedings due to the then-pending Supreme Court consideration of *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020), *vacated and remanded*, *ex. rel. Hughes v. Northwestern University*, 142 S. Ct. 737 (2022). (Appx0623-0633.) Plaintiffs filed an opposition thereto on July 21 (Appx0634-0708), and the district court denied the motion on July 22 (Appx0709- 0710).

0758.) The court held a video hearing on the motion to dismiss on September 2 and took the matter under advisement. (Appx0861-0899.) On October 4, the district court granted Defendants' motion to dismiss, granting Plaintiffs leave to amend ("*Mator I*".) (Appx0045-0060.)

On October 18, 2021, Plaintiffs filed an Amended Complaint (Appx0807-0860). Defendants, again, filed a motion to dismiss for failure to state a claim on November 15. (Appx0900-1604.) Plaintiffs filed an opposition to the motion to dismiss on December 13. (Appx1605-1980.) Defendants filed a reply brief on January 7, 2022. (Appx1981-1999.) The district court, *sua sponte*, ordered (via text order) the parties to submit supplemental briefing in light of the Supreme Court's decision in *Hughes v. Northwestern Univ.*, 142 S. Ct. 737 (2022), vacating the Seventh Circuit's dismissal of similar claims. Both Plaintiffs and Defendants then submitted supplemental briefing (Appx2000-2014) and responses in opposition to supplemental briefing (Appx2015-2025.) On April 7, the district court granted Defendants' motion to dismiss, and granted Plaintiffs leave to amend ("*Mator II*") (Appx0026-0044).

On April 21, 2022, Plaintiffs filed a Second Amended Complaint ("SAC"). (Appx2109-2165.) Defendants filed a Rule 12(b)(6) motion to dismiss on May 19 (Appx2166-2840.) Plaintiffs filed an opposition to the motion to dismiss on June 24. (Appx2841-2874.) Defendants filed a reply brief on July 18. (Appx2875-2904.) On

11

August 18, the district court granted the motion to dismiss the Second Amended Complaint ("*Mator III*") (Appx0005-0025) and entered judgment in Defendants' favor (Appx0004.)

Plaintiffs timely filed a Notice of Appeal as to *Mator I, II and III* to this Court on August 22, 2022. (Appx0001-0003.)[3]

## SUMMARY OF THE ARGUMENT

This Court should vacate the Order and Judgment of the district court in *Mator III* granting Defendants' Rule 12(b)(6) motion to dismiss and remand this case to the district court for further proceedings. (Appx0005-0025.) In rendering its decision, the district court committed reversible error in light of the Supreme Court's decision *Hughes*, 142 S. Ct. 737 (2022), and based upon this Court's decision in *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020). The district court erred by not viewing the allegations of the Second Amended Complaint as a whole, failing to accept Plaintiffs' factual allegations as true, and improperly weighing the parties respective positions to make factual determinations, without the benefit of discovery, at the pleadings stage of the litigation.

The Supreme Court in *Hughes* reaffirmed that the allegations of a complaint must be considered as a whole to determine whether Plaintiffs "have plausibly

---

[3] The district court stated in *Mator III*, that "the focus of this Court's analysis will be whether Plaintiffs' Second Amended Complaint has cured the pleading deficiencies" identified in *Mator I* and *Mator II*. (Appx0010-0011.)

alleged a violation of the duty of prudence as articulated in *Tibble*" and applied in *Sweda*. *Hughes*, 142 S. Ct. at 742 (citing *Tibble v. Edison Int'l*, 575 U.S. 523 (2015), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). "'[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote and unlikely.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (quoting *Twombly*, 550 U.S. at 556) (internal quotations omitted).

The district court did exactly what the Supreme Court and this Court in *Sweda* and *Fowler* held should not be done. The district court applied the wrong standard in each of its decisions, which infected its entire analysis. In each of its decisions, instead of evaluating whether Plaintiffs "state a claim to relief that is ***plausible*** on its face" (*Iqbal*, 556 U.S. at 678) (emphasis added), the district court improperly applied a ***probability*** standard. *See* Appx0017, quoting *Johnson v. PNC Fin. Servs. Grp., Inc*., 2:20-CV-01493-CCW, 2021 U.S. Dist. LEXIS 149408, at *13 (W.D. Pa. Aug. 3, 2021) ("*Johnson I*") (holding that plaintiffs "allegations must cross 'the threshold from possible to probable.'"), *dismissed in part*, 2022 U.S. Dist. LEXIS 60711 (W.D. Pa. Mar. 31, 2022) (*"Johnson II"*); Appx0036 (same, quoting *Johnson I*) ("allegations must cross 'the threshold from possible to probable."); Appx0055 (same, quoting *Johnson I*) ("allegations must cross 'the threshold from possible to probable.") However, "'[t]he plausibility standard is ***not*** akin to a 'probability

requirement,' but it asks for more than the sheer possibility that a defendant has acted unlawfully.'" *Johnson II*, 2022 U.S. Dist. LEXIS 60711, at *8 (quoting *Twombly*, 550 U.S. 556) (emphasis added). As a result of applying this wrong, more exacting standard, the district court impermissibly weighed the parties' competing evidence at the pleadings stage, "parsed [the Complaint] piece by piece," and required Plaintiffs "to rule out every possible lawful explanation for the conduct [they] challenge," contrary to this Court's decision in *Sweda*. 923 F.3d at 326, 331; *see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009); *Sacerdote v. New York Univ.*, 9 F.4th 95, 108 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022).[4] And when there were evidentiary gaps, the district court improperly filled in those gaps by making assumptions (that proved to be incorrect).[5]

---

[4] *See* Appx0013-0014; Appx0023-0024, (requiring Plaintiffs to pursue more details about higher cost share classes other benefits – such as services telephone support services – dismissing claim because Plaintiffs offered "no new allegations"); *Id.* at Appx0013; Appx0021-0022, (requiring Plaintiffs' to use comparator plans exact in asset and participant size); *Id.* at Appx0014; Appx0022 (requiring Plaintiffs to "capture all the details, nuances, and scope of different [Recordkeeping] services" and "have the same list codes relative to services"); *Id.* at Appx0019 (requiring Plaintiffs to 'account for quality of services' and 'articulate what particular discovery would assist the parties and Court in the assessment of Wells Fargo's services and its comparators.')

[5] *See* Appx0014-0015; Appx0022-0023 (requiring Plaintiffs to plead "additional details as to fee structures and services provided" and incorrectly stating that Plaintiffs calculated direct and indirect fees for the Plan and comparator plans differently). *See also* n.17 *infra*.

First, the court erroneously granted dismissal of Plaintiffs' share-class claim by side-stepping precedent, and instead, shifting the burden to Plaintiffs at the pleading stage to address whether the higher cost share classes may have offered other benefits. (Appx0013, Appx0023-0024; Appx0040-0043; Appx0058-0059.) Second, the district court erroneously granted dismissal of Plaintiffs' excessive Recordkeeping fee claims, requiring Plaintiffs to move the factual ball forward to "allege the complete nature and scope of services provided" and cure "pleading deficiencies" without the benefit of discovery. (Appx0013-0014, Appx0019, Appx0021-0022; Appx00394; Appx0056.) Third, the court erroneously dismissed Plaintiffs' monitoring claim as derivative of Plaintiffs' breach of fiduciary claims as insufficiently pled. (Appx0024; Appx0043; Appx0059-0060.)

Courts in this Circuit and nationwide have overwhelmingly followed the holding of *Hughes* by denying motions to dismiss for the very type of imprudence allegations that are pled in the Second Amended Complaint.[6] These recent cases *add*

---

[6] *See, e.g.*, *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 U.S. App. LEXIS 10323 (9th Cir. 2022); *Davis v. Salesforce*, No. 21-1587, 2022 U.S. App. LEXIS 9527 (9th Cir. 2022); *Reichert v. Jupiter Networks, Inc.*, No. 21-cv-06213-JD, 2022 U.S. Dist. LEXIS 76599 (N.D. Cal. Apr. 27, 2022); *Carrigan v. Xerox Corp.*, No. 3:21-cv-1085 (SVN), 2022 U.S. Dist. LEXIS 70428 (D. Conn. Apr. 18, 2022); *Smith v. VCA, Inc.*, No. 21-cv-9140-GW-AGRx, 2022 U.S. Dist. LEXIS 103585 (C.D. Cal. Apr. 6, 2022); *Johnson v. PNC Fin. Servs. Grp., Inc.*, 2:20-cv-01493 No. 1-10, 2022 U.S. Dist. LEXIS 60711 (W.D. Pa. Mar. 31, 2022); *Sacerdote v. New York Univ.*, 9 F.4th 95 (2d Cir. 2021), *cert. denied.*, 142 S. Ct. 1112 (2022); *Smith v. Shoe Show, Inc.*, No. 1:20-cv-00813-WO-JEP, 2022 U.S. Dist. LEXIS 33823 (M.D.N.C. Feb. 25, 2022); *Lauderdale v. NFP Ret., Inc.*, No. 8:21-cv-00301-JVS-KES, 2022 U.S. Dist.

to the wealth of caselaw prior to *Hughes*, both within the Third Circuit and in courts nationwide, denying motions to dismiss where plaintiffs' allege similar breaches of fiduciary duty.[7] Despite this overwhelming precedent, the district court relied

---

LEXIS 26397 (C.D. Cal. Feb. 8, 2022); *Bangalore v. Froedtert Health*, No. 2:20-cv-00893-PP, 2022 U.S. Dist. LEXIS 13864 (E.D. Wis. Jan. 26, 2022); *Shaw v. Quad/Graphics, Inc.*, No. 2:20-cv-01645-PP, 2022 U.S. Dist. LEXIS 13861 (E.D. Wis. Jan 26, 2022); *Goodman v. Columbus Reg'l. Healthcare Sys.*, 4:21-cv-15 (CDL), 2022 U.S. Dist. LEXIS 13489 (M.D. Ga. Jan. 25, 2022); *Turpin v. Duke Energy Corp.*, 2021 U.S Dist. LEXIS 40457 (W.D.N.C. Mar. 4, 2021), *report and recommendation adopted by* 2022 U.S. Dist. LEXIS 17160 (W.D.N.C. Jan. 31, 2022).

[7] *See, e.g.*, *Singer v. Barnabas Health, Inc.*, 2021 U.S. Dist. LEXIS 72282 (D.N.J. 2021); *Boley v. Universal Health Servs., Inc*., 498 F. Supp. 3d 715 (E.D. Pa. 2020); *Peterson v. Ins. Servs. Office, Inc.*, 2021 U.S. Dist. LEXIS 70877 (D.N.J. 2021); *In re Quest Diagnostics Inc. ERISA Litig.*, 2021 U.S. Dist. LEXIS 85722 (D.N.J. 2021); *Hay v. Gucci Am., Inc.*, 2018 U.S. Dist. LEXIS 171193 (D.N.J. 2018); *Serv. Emps. Int'l Union, Dist. 1199P v. Monsour Med. Ctr., Inc.*, 555 F. Supp. 2d 566 (W.D. Pa. 2008); *Cannon v. MBNA Corp.*, 2007 U.S. Dist. LEXIS 48901 (D. Del. 2007); *Allison v. L Brands, Inc.,* 2021 U.S. Dist. LEXIS 35551 (S.D. Ohio 2021); *Savage v. Sutherland Glob. Servs., Inc*., 521 F. Supp. 3d 308 (W.D.N.Y. 2021); *Falberg v. Goldman Sachs Grp., Inc*., 2020 U.S. Dist. LEXIS 121457 (S.D.N.Y. 2020); *Lutz v. Kaleida Health*, 2019 U.S. Dist. LEXIS 130513 (W.D.N.Y. 2019); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673 (D. Conn. 2018); *In re M&T Bank Corp.*, 2018 U.S. Dist. LEXIS 154641 (W.D.N.Y. 2018); *Cunningham v. Cornell Univ.*, 2017 U.S. Dist. LEXIS 162420 (S.D.N.Y. 2017); *Cates v. Trs. of Columbia Univ. in City of New York*, 2017 U.S. Dist. LEXIS 138330 (S.D.N.Y. 2017); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056 (M.D. Tenn. 2018); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344 (N.D. Ga. 2017); *Kelly v. Johns Hopkins Univ*., 2017 U.S. Dist. LEXIS 161547(D. Md. 2017), *recons. denied*, 2018 U.S. Dist. LEXIS 137634 (D. Md. 2018); *Daugherty v. Univ. of Chicago*, 2017 U.S. Dist. LEXIS 155948 (N.D. Ill. 2017); *Nicolas v. Trs. of Princeton Univ*., 2017 U.S. Dist. LEXIS 151775 (D.N.J. 2017); *Clark v. Duke Univ.*, 2017 U.S. Dist. LEXIS 164370 (M.D.N.C. 2017); *Tracey v. MIT*, 2017 U.S. Dist. LEXIS 165070 (D. Mass. 2017).

heavily on cases from outside the Third Circuit and cases that pre-date *Hughes* and *Sweda*.

Under the pleading and prudence standards articulated in *Hughes* and *Sweda*, Plaintiffs' Second Amended Complaint is well-pled and states plausible claims for relief. Plaintiffs' allegations raise the plausible inference that Defendants passively allowed its recordkeeper to charge unreasonable and excessive Recordkeeping fees that were multiples higher than market rates, and stock the Plan with higher-cost retail share classes of funds when otherwise identical lower-cost institutional shares were available. Defendants failed to take advantage of the Plan's large scale in order to provide significant benefits to its participants and were, rather, "asleep at the wheel." *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020). Defendants did not face any "difficult tradeoffs" (*Hughes*, 142 S. Ct. at 742) as they were not prevented in any way from investigating or negotiating for lower Recordkeeping fees or inclusion of lower-cost shares of mutual funds. Further, conducting a bidding process for a new recordkeeper would have at least placed competitive pressure on Wells Fargo to offer its best pricing to avoid potentially losing millions of dollars of the Plan's assets.

Accordingly, the district court erroneously dismissed Plaintiffs' claims, "depriv[ing] [Plaintiffs] of the benefit of the Court's adjudication of the merits of its claims before the court considers any evidence." *Sweda*, 923 F.3d at 325.

17

## STANDARD OF REVIEW

The Third Circuit exercises plenary review of a district court's order granting a Rule 12(b)(6) motion to dismiss a complaint. *Sweda*, 923 F.3d at 325; *Renfro v. Unisys Corp.*, 671 F.3d 314, 320 (3d Cir. 2011).

The Federal Rules of Civil Procedure require that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). The Supreme Court in *Twombly* and *Iqbal* set forth two main principles underlying the standard of review on a Rule 12(b)(6) motion to dismiss a complaint. *Twombly*, 550 U.S. at 544; *Iqbal*, 556 U.S. at 662. First, a court "must accept as true all of the factual allegations contained in the complaint" construing it in the light most favorable to the plaintiff. *Twombly*, 550 U.S. at 572; *Perrone v. Johnson & Johnson*, 48 F.4th 166 (3d Cir. 2022). Second, the allegations of the complaint, considered as a whole, must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is **plausible** on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570) (emphasis added); *Sweda*, 923 F.3d at 325; *Fowler*, 578 F.3d at 210.

Facial plausibility of a claim exists when the factual content pleaded "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required. *Twombly*, 550 U.S. at 555. The

plaintiff must plead facts that move the "claims across the line from conceivable to plausible." *Id.* at 570; *Renfro*, 671 F.3d at 320. "Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief." *Iqbal*, 556 U.S. at 678.

Applying pleading the standards of *Twombly* and *Iqbal* requires an examination of the underlying substantive law. *Iqbal*, 556 U.S. at 675; *Renfro*, 672 F.3d at 321. Derived from the law of trusts, the fiduciary duties imposed by ERISA are among "the highest known to the law." *Sweda*, 923 F.3d at 333  (internal citation and quotations omitted). The elements of an ERISA breach of fiduciary duty claim are: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing loss to the plan." *Sweda*, 923 F.3d at 328.

The Supreme Court in *Hughes* reiterated that ERISA requires plan fiduciaries to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Hughes*, 142 S. Ct. at 739 (quoting 29 U.S.C. § 1104(a)(1)(B)). A fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones." *Id.* at 741, quoting *Tibble*, 575 U.S. at 530. "[T]his standard requires that fiduciaries not only prudently select and monitor investments, but also 'understand and monitor plan expenses,' because expenses like

administrative fees can 'significantly reduce the value of an account in a defined-contributions plan.'" *Johnson II*, 2022 U.S. Dist. LEXIS 60711, at *14 (quoting *Sweda*, 923 F.3d at 333, 328 (citation omitted)); *Tibble*, 575 U.S. at 525.

A "context-specific" inquiry is required, based upon the "'circumstances prevailing at the time' [of] the fiduciary acts." *Hughes*, 142 S. Ct. at 741, quoting *Fifth Third Bancorp*, 573 U.S. at 425. A fiduciary's process "must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions." *Sweda*, 923 F. 3d at 329.

## ARGUMENT

### I.    The District Court Erred In Dismissing The Second Amended Complaint By Applying An Improper Standard Of Review To A Rule 12(b)(6) Motion To Dismiss

The district court erred in granting the motion to dismiss by applying an improper standard of reviewing a Rule 12(b)(6) motion to dismiss. In rejecting Plaintiffs' allegations, the district court did not follow Supreme Court precedent set by *Hughes*, reiterating *Tibble*, *Twombly* and *Iqbal*, or by this Court in *Sweda*. Instead, the district court subjected Plaintiffs' Complaint to a significantly higher level of scrutiny using a *probability* standard rather than the appropriate *plausibility* standard of pleading, and "parsed [the complaint] piece-by-piece" questioning well-pled factual allegations. *Sweda*, 923 F.3d at 331.

The district court did not view the "allegations as a whole," *Hughes*, 142 S. Ct. at 739, or "construe the complaint in the light most favorable to the plaintiff." *Sweda*, 923 F.3d at 325; *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016); *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). "Requiring a plaintiff to rule out every possible lawful explanation for the conduct he challenges would invert the principle that the complaint is construed most favorably to the nonmoving party." *Sweda*, 923 F.3d at 326; *see also Sacerdote*, 9 F.4th at 108. Indeed, a complaint should *not* be "parsed piece by piece to determine whether each allegation, in isolation, is plausible" since participants do not have direct evidence of how fiduciaries reached their decisions. *Sweda*, 923 F.3d at 331 (quoting *Braden*, 588 F.3d at 594). "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote and unlikely." *Fowler*, 578 F.3d at 213.

Careful analysis under the proper standard of review is particularly important in cases arising under ERISA due to the unique nature of these claims. "Because plaintiffs in an ERISA claim may not always have access to the information necessary to support their claim, courts have evaluated pleadings in ERISA claims with special scrutiny." (Appx0016-0017.) *See also Sacerdote*, 9 F.4th at 107. Therefore, dismissal at this stage may deny plaintiffs the right to file meritorious claims against fiduciaries who have actually violated their duties under ERISA.

Additionally, "many allegations concerning fiduciary conduct, such as reasonableness of compensation for services are inherently factual questions" not to be addressed at the motion to dismiss stage. *Sweda*, 923 F.3d at 329. The job of the court is not to determine whether the alleged facts are *actually* true, but rather to determine whether, if they are true, the plaintiffs have *plausibly* stated a claim upon which relief can be granted.

Applying the pleading standards set forth by the Supreme Court and the Third Circuit, the district court erred in dismissing Plaintiffs' complaint. Taking Plaintiffs' well-pleaded factual allegations as true and drawing reasonable inferences in their favor, Plaintiffs' Second Amended Complaint contains sufficient factual matter to state plausible claims that Defendants breached ERISA's duty of prudence.

## II.    **Plaintiffs' Plausibly Alleged Defendants Breached Their Fiduciary Duties By Imprudently Providing Higher-Cost Share Classes of Funds When Identical Lower-Cost Share Classes Were Available**

The district court erred in dismissing Plaintiffs' share class claims. Plaintiffs state a plausible claim for relief by alleging that for nineteen of the Plan's mutual funds, Defendants provided only higher-cost retail share classes when otherwise *identical* lower-cost institutional share classes of the same funds were available. (Appx2153 ¶ 137). The fiduciaries did not wield the Plan's "power…to obtain favorable investment products, particularly when those products are substantially

identical other than their lower cost to products the trustee has already selected." *Sweda*, 923 F.3d at 328-29 (quoting *Tibble*, 843 F.3d at 1198).

The "numerous and specific" (*id.* at 332) factual allegations in support of the imprudent higher-cost share class claim are well-pled as follows:

(i)     Defendants, as fiduciaries to the Plan, were and are obligated to prudently ensure that Plan's fees and expenses are limited to a reasonable level for the size of the Plan, and to continuously monitor investment fees against applicable benchmarks, peer groups, and the market, in order to identify objectively unreasonable and unjustifiable fees (Appx2111 ¶¶ 8, 10);

(ii)     Defined contribution fiduciaries have exclusive control over the meu of investment options to which participants may direct the assets in their accounts, which typically include mutual funds (Appx2120 ¶ 42; Appx2127 ¶ 61);

(iii)     Mutual fund fees are usually expressed as an "expense ratio", which are deducted from a mutual fund's assets thereby reducing the value of the shares owned by the plan (Appx2127 ¶ 63);

(iv)     Some mutual funds engage in the practice of "revenue sharing" where the fund pays a portion of its expense ratio to the plan's recordkeeper as compensation for providing "recordkeeping" services (Appx2128 ¶¶ 65-66);

(v)    "Recordkeeping" is a catchall term for an entire suite of recordkeeping and related administrative expenses typically provided by, and *charged by*, the plan's recordkeeper (Appx2123-2127 ¶¶ 50-60);

(vi)    These revenue-sharing payments are asset-based as the amount invested in the mutual fund increases, so do the expense ratios charged to the plan. Plans are often saddled with growing expense ratios despite its number of participants, its investment services, and its recordkeeping services remaining the same. (Appx2131 ¶ 74.) Fiduciaries must monitor the amount of revenue sharing paid to service providers to make sure the plan is not paying unreasonably high fees, and remedy any overpayment by reducing the amount of revenue sharing paid by choosing less expensive share classes or requiring the service provider to rebate the excess to the plan or its participants. (Appx2133 ¶ 83, Appx2151 ¶ 132);

(vii)    Mutual funds offer multiple share classes of shares in a single mutual fund that are targeted at different investors. (Appx2151 ¶ 129.) The share classes have identical portfolio managers, underlying investments, and asset allocations, and differ only in cost. (*Id.*) Generally, more expensive retail share classes are targeted at smaller investors with less bargaining power, while lower-cost institutional shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. (*Id.*);

(viii)  "Large" retirement plans like the Wesco Plan have sufficient assets to qualify for the lowest cost share class available, and have massive bargaining power to negotiate low fees, or have fees waived, for investment management services. Fiduciaries must review mutual fund prospectuses in order to determine if a lower-cost share class of the same fund is available. (Appx2111 ¶ 7, 9; Appx2151 ¶¶ 130-31);

(ix)   Plaintiffs reviewed the Plan's investment options and determined, from the each of the prospectuses, that nineteen mutual funds offered higher-cost share class options even though lower-cost, otherwise identical, share class options of the same mutual funds were available (Appx2153-2154 ¶¶ 137, 138);

(x)   These lower-cost share class options were available for the years 2015-2019, and the lower-cost expense ratios of each did not materially change during this time period (Appx2153 ¶ 137);

(xi)   Plaintiffs reviewed the Plan's Administrative Services Agreement with Wells Fargo to determine that these nineteen higher-cost share classes of mutual funds charged expense ratios that were used for revenue sharing payments towards the (already excessive) recordkeeping and administrative fees of the Plan, despite these fees being separately charged by Wells Fargo (Appx2152-2153 ¶¶ 133-35);

(xii)   Investment in the nineteen higher-cost share classes of mutual funds did not offer the potential for higher returns as revealed in the funds' prospectuses, all

of the lower-cost share classes of the same funds outperformed the higher-cost alternatives, primarily by the difference in the operating expenses (Appx2155 ¶ 139);

(xiii) Investment in the nineteen higher-cost share classes of mutual funds pose the same risk factors as their lower-cost counterparts in that all are publicly traded (Appx2155 ¶ 139);

(xiv) The level of services offered by a higher-cost share class of mutual fund is irrelevant to the Plan since its recordkeeper was paid to perform its administrative services for shares that were bought in bulk (Appx2155 ¶ 139);

(xv) Plaintiffs calculated, as an example, that in *one year* for a single fund, participants unnecessarily paid more than $100,000 in expenses by investing in the higher-cost share classes mutual fund offered by the Plan than what they would have paid had the Plan offered the otherwise identical lower-cost share class of the fund compounding these imprudent investments over time, Plan participants paid in excess of $700,000 to $900,00 per year (Appx2154 ¶ 138); and

(xvi) Had the fiduciaries prudently investigated and monitored the Plan's investment options, they would have leveraged the Plan's substantial bargaining power and (a) selected available and otherwise identical lower-cost share classes of mutual funds, and (b) required Wells Fargo to rebate the excessive revenue-sharing fees (Appx2111 ¶ 11; Appx2153 ¶ 136).

These factual allegations plausibly allege that Defendants' *inactions* constituted a breach of their fiduciary duties by <u>not</u> "prudently select[ing] investments, and fail[ing] to 'monitor . . . investments and remov[ing] imprudent ones.'" *Sweda*, 923 F. 3d at 328 (quoting *Tibble*, 575 U.S at 528. The Plan's fiduciaries "must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." *Tibble*, 575 U.S. at 529 (quoting George T. Bogert et. al., *The Law of Trusts & Trustee* § 684 (3d ed. 2009)) (brackets in *Tibble*). Fiduciaries must "conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes*, 142 S. Ct. at 742 (citing *Tibble*, 575 U.S. at 529–30). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id*.

The district court granted dismissal of Plaintiffs' share-class claim in the Second Amended Complaint holding that "Plaintiffs offer no new allegations regarding their share-class claims…the Court will again reiterate its prior analyses and conclusions with regard [to this claim]." (Appx0024). The district court's "prior analyses and conclusions" in its order dismissing the Amended Complaint rested on what it called a "dearth of Third Circuit case law that addresses ERISA product management criteria in relation to the purchase of higher cost (retail) shares versus lower cost (institutional) shares." (Appx0041.) In doing so, the district court not only

27

improperly side-stepped *Hughes* and *Sweda*, but also other post-*Hughes* cases ruled upon by other Circuits that dealt with the same share-class claims.

The Supreme Court in *Hughes* was faced with the same allegations, *as here*, of a breach of fiduciary duty due to "neglecting to provide cheaper and otherwise-identical alternative investments." *Hughes*, 142 S. Ct. at 741. The Supreme Court reversed the Seventh Circuit's dismissal of plaintiffs' share class claims, holding that "a fiduciary is required to conduct a regular a regular review of its investment" and "[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id.* at 741-42, citing *Tibble*.

In *Tibble*, the Supreme Court allowed claims to proceed where, *as here*, the fiduciaries provided "higher priced retail-class mutual funds…when materially identical lower priced institutional-class mutual funds were available" that provided "effectively the same…mutual funds at [a] lower price." *Tibble*, 575 U.S. at 525–26. The Supreme Court, and after remand, the Ninth Circuit, allowed the claim to proceed even though only *three* retail-class mutual funds were at issue. *Id*. at 526, 530–31; *Tibble v. Edison Int'l*, 843 F.3d 1187, 1199 (9th Cir. 2016) (remanding "on an open record for trial on the claim that…defendants should have switched from

retail-class fund shares to institutional-class fund shares to fulfill its continuing duty to monitor the appropriateness of the trust investments").[8]

This Court, in *Sweda*, was also faced with the same share-class claims wherein plaintiffs alleged that the defendants "selected and retained identically managed but higher cost retail class shares." *Sweda*, 923 F.3d at 331. The Court recognized that the *Sweda* plaintiffs, *like here*, "included a table comparing options in the Plan with readily available cheaper alternatives" and allegations of underperformance. *Id.* Upon its "holistic" review of well-pled allegations and "other germane factors such as reasonableness of fees, selection and retention of investment options, and practices of similarly situated fiduciaries," this Court held that the *Sweda* plaintiffs "plausibly alleged breach of fiduciary duty" since they "offered specific comparisons" with "readily available alternatives." *Id.* at 331-32.

Here, the district court improperly held that "[d]espite the absence of Third Circuit authority...the persuasive authority matches the principles in *Sweda*." (Appx0059; Appx0058.)[9] In doing so, the district court relied upon stale Ninth Circuit authority, rather than current, post-*Hughes* caselaw in both in *Kong* and

---

[8] The plaintiffs subsequently prevailed at trial. *Tibble v. Edison Int'l.*, 2017 U.S. Dist. LEXIS 130806 (C.D. Cal. Aug. 16, 2017).

[9] The district court's Orders granting Defendants' motion to dismiss the complaint and motion to dismiss the amended complaint are almost identical with respect to the court's holding on Plaintiffs' share class claims. (*See* Appx0041-0042; Appx2121-2123.)

*Davis*.[10] See *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 U.S. App. LEXIS 10323, at *2 (9th Cir. 2022) (unpublished) (reversing the district court's dismissal of plaintiffs' share-class claims where "the operative complaint plausibly alleges a failure to provide cost-effective investments with reasonable fees" where defendants "failed to monitor and control the offering of a number of mutual funds in the form of 'retail' share classes that carried higher fees than those charged by otherwise identical institutional' share classes of the same investments. Except for the extra fees, the share classes were identical."); *Davis v. Salesforce.Com, Inc.*, No. 21-15867, 2022 U.S. App. LEXIS 9527, at *2 (9th Cir. 2022) (unpublished) (reversing dismissal of share class claims where "plaintiffs have stated a plausible claim that defendants imprudently failed to select lower-cost share classes or collective investment trusts with substantially identical underlying assets.") *See also Sacerdote*, 9 F.4th at 105–10 (reversing dismissal of share class allegations where plaintiffs "alleged that a superior alternative investment was readily apparent such that an adequate investigation—simply reviewing the prospectus of the fund under consideration—would have uncovered that alternative.").

---

[10] The district court relied on the unpublished decision in *White v. Chevron Corp.*, No. 16-0793, 2017 U.S. Dist. LEXIS (N.D. Cal. May 31, 2017), *aff'd*, 752 Fed. Appx. 453 (9th Cir. 2018), and the (now reversed) decision in *Kong v. Trader Joe's Co.*, 2020 U.S. Dist. LEXIS 224835 (C. D. Cal., Nov. 30, 2020). Post *Hughes*, the Ninth Circuit's opinions in *Kong* and *Davis* reflect that White is no longer good law even in the Ninth Circuit.

The district court improperly weighed and parsed the evidence and shifted the burden to Plaintiffs at the pleading stage by holding that "Plaintiffs have not addressed whether the retail share class may have offered other benefits." (Appx0042.) As discussed above, that analysis reflects that the district court applied the wrong standard. "Plaintiffs need not 'directly allege how [defendants] mismanaged the Plan,' so long as there is 'substantial circumstantial evidence' to permit the Court to 'reasonably infer that a breach has occurred.'" *Silva v. Evonik Corp.*, No. 20-cv-2202, 2020 U.S. Dist. LEXIS 250206, at *10 (D.N.J. Dec. 30, 2020) (quoting *Sweda*, 923 F.3d at 332). The Sixth Circuit court in *Forman v. TriHealth*, 40 F.4th 443, 450 (6th Cir. 2022), upheld allegations of imprudence that rested on offering "pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional share of the same funds." The Court held that taken "in their most flattering light, these allegations permit the reasonable inference that [defendants] failed to exploit the advantages of being a large retirement plan that could use scale to provide substantial benefits to its participants." *Id.* Unlike the improper parsing analysis the district court required here, the Sixth Circuit made clear that plaintiffs alleging such share class claims need *not* "address[] whether the retail share class may have offered benefits" as the district court did here  (Appx0042.) To the contrary:

> Equally reasonable inferences in the other direction, we appreciate, could exonerate [defendants] once all of the facts come in. Perhaps the

fund is not large enough or does not have enough participants interested in a particular investment to qualify for the less expensive share class. Perhaps the plan has revenue-sharing arrangements in place that make the retail shares less expensive or that benefit plan participants on the whole. But at the pleading stage, it is too early to make these judgment calls. "In the absence of further development of the facts, we have no basis for crediting one set of reasonable inferences over the other. Because either assessment is plausible, the Rules of Civil Procedure entitle [the three employees] to pursue [their imprudence] claim (at least with respect to this theory) to the next stage."

*TriHealth*, 40 F.4th 443, 450 (quoting *Fabian v. Fulmer Helmets*, 628 F.3d 278, 281

(6th Cir. 2010)).[11] *See also Davis*, 960 F.3d at 483-84 (reversing dismissal of share

class claims holding two plausible inferences of mismanagement: one, that the

fiduciaries did not negotiate aggressively enough to gain access to institutional

shares; and two, that they were "asleep at the wheel [and they] failed to pay close

enough attention to available lower-cost alternatives.").

---

[11] It is important to note that the Sixth Circuit specifically distinguished its earlier decision in *Smith v. CommonSpirit Health*, 2022 U.S. App. LEXIS 17043 (6th Cir. 2022) (affirming dismissal). To the extent that Defendants may rely on that decision, it is distinguishable because, unlike here, it alleged imprudence based upon offering higher-cost *actively managed funds* instead of lower-cost *passively managed funds*, not different share classes (*i.e.*, retail vs. institutional) of *the same* mutual fund. *See also* the underlying complaint in *Smith v. CommonSpirit Health*, No. 2:20-cv-95 (E.D. Ky. Jul. 2, 20220) (ECF No. 1). Another Sixth Circuit case, *Forman v. TriHealth*, 40 F.4th 443, 449 (6th Cir. 2022) is also factually distinguishable, wherein the court dismissed the share class claims because plaintiffs did not plead that the "available alternatives were otherwise equivalent to the selected funds). Similarly, in *Albert v. OshKosh*, 47 F.4th 540, 581 (7th Cir. 2022) the Seventh Circuit dismissed share class claims where plaintiffs compared actively versus passively managed funds and because plaintiffs argued "the inverse of what ERISA plaintiffs typically argue—that a plan should have offered cheaper institutional share classes instead of more expensive retail share classes."

The district court erred in failing to view Plaintiffs' well-pled factual allegations as a whole, failing to credit all inferences in Plaintiffs' favor, improperly weighing evidence, and improperly applying a probability standard when controlling precedent by the Supreme Court and this Court required application of the plausibility standard. This Court should reverse the dismissal of Plaintiffs' share class claims so Plaintiffs here have the same opportunity as the plaintiffs in *Tibble*, who prevailed at trial on their share class claims.

## III. Plaintiffs' Plausibly Alleged Defendants Breached Their Fiduciary Duties By Imprudently Incurring Excessive Recordkeeping Fees

The district court erred in dismissing Plaintiffs' excessive Recordkeeping fees claim by engaging in a multifold fact-finding determination as to whether the comparator plans are apt comparisons, which is improper at the pleadings stage. Like in *Sweda*, here "the District Court erred by 'ignor[ing] reasonable inferences supported by the facts alleged,' and by drawing 'inferences in [Defendants'] favor [while]   faulting [Plaintiffs] for failing to plead facts tending to contradict those inferences.'" *Sweda*, 923 F. 3d at 332, quoting *Braden*, 588 F. 3d at 595.

Plaintiffs' well-pled allegations as to Defendants' imprudence in allowing the Plan's recordkeeper to receive excessive and unreasonable fees are as follows:

(i)     From 2009 through 2020, the Plan's recordkeeper was Wells Fargo, which provided a typical suite of recordkeeping and administrative services ("Recordkeeping") to the Plan (Appx2136-2137 ¶¶ 93-94);

(ii)   All national recordkeepers, like Wells Fargo, have the capability to provide all of the same services to all large defined contributions plans, like the Plan, and any minor variations in the way these services are delivered have no material impact on the fees charged (Appx2123-2125 ¶¶50-53);

(iii)   The market for Recordkeeping services is highly competitive, and the practice of national recordkeepers is to bid for and quote fees on a "per-participant" basis with immaterial cost differences in services (Appx2125). A flat per-participant method of calculating and benchmarking Recordkeeping fees is industry standard (Appx2130 ¶¶ 72-73; Appx2137 ¶ 95);

(iv)   A recordkeepers' cost for providing services depends on the number of plan participants, not the amount of plan assets or the amount in individual accounts for example, the cost for recordkeeping a $75,000 account balance is the same as a $7,500 account balance (Appx2130 ¶ 73). Therefore, a flat, capped per participant fee ensures compensation is tied to the actual services provided, rather than unnecessarily and exponentially growing when tied to asset size, or unequally charged among participants when tied to account size, both to the recordkeepers' monetary benefit (*id.*);

34

(v)     Fiduciaries must ensure that the amount of compensation paid to its recordkeepers is reasonable, by evaluating and monitoring fees including: Fully understanding all sources of revenue paid to the recordkeepers; soliciting competitive bids from other recordkeepers to compare the reasonability of rates; and negotiating the payment of fees including by requiring a rebate of any amounts that exceed a reasonable level (Appx2131-2136 ¶¶ 75-92);

(vi)    The Plan's Form 5500s and its services agreement with Wells Fargo (Appx1193-1213) revealed that Wells Fargo was compensated for Recordkeeping by assessing "direct" fees and "indirect" revenue-sharing fees, which were excessive when benchmarked against the same or similar Recordkeeping services offered by comparator plans (Appx2130 ¶ 71; Appx2137-2140 ¶¶ 96-99);

(vii)   From 2015–2020, Wells Fargo charged the Plan between $50-$82 per participant in direct Recordkeeping fees (Appx2138 ¶ 97). These direct fees were not capped on a per participant basis or at a certain dollar figure and Wells Fargo was not required to refund excess amounts (*Id.*). These direct fees alone were unreasonable compared to the lower total fees paid by comparable plans (*Id.*);

35

(viii)   In addition, from 2015-2020, Wells Fargo charged the Plan between $80-$103 per participant in indirect Recordkeeping fees obtained through revenue sharing from its mutual fund investments (Appx2139 ¶ 98). These indirect fees were not capped on a per participant basis or at a certain dollar figure and Wells Fargo was not required to refund excess amounts (*Id.*). These indirect fees alone were unreasonable compared to a lesser amount of total fees paid by comparable plans (*Id.*);

(ix)   In total, from 2015-2020, the Plan was charged the equivalent of $110-$185 in direct and indirect Recordkeeping fees and, in effect, paid Wells Fargo twice for the same services (Appx2140-2141 ¶¶ 99-100);

(x)   These direct and indirect Recordkeeping fees were unreasonably excessive when compared to the fees paid by other defined contribution plans of similar size and assets who also used Wells Fargo as recordkeeper (Appx2141-2143 ¶¶ 100-105). Plaintiffs provided as examples five such comparable plans that reveal they paid Wells Fargo only between $37-$52 in total direct and indirect fees in 2018 (67% less than the fees paid by the Plan) (Appx2141-2143 ¶¶102-105);

(xi)   Plaintiffs further provided eleven additional comparable plans that used other top national recordkeepers to show that they paid between $31 -

$53 in total direct and indirect fees in 2018 (66% less than the fees paid by the Plan) (Appx2143-2145 ¶¶ 106-108);

(xii)   Based on Plaintiffs' research of the comparable plans, as well as industry literature, a reasonable total fee for Recordkeeping services was $42 per participant between 2015-2020 (Appx2145-2147 ¶¶ 109-113);

(xiii)  Therefore, the Plan paid almost four times the reasonable fee for its Recordkeeping services from 2015-2020, causing injury by eating into and substantially reducing Plan participants retirement savings to the tune of millions of dollars. (Appx2112 ¶ 13; Appx2137 ¶ 96; Appx2148 ¶ 115; Appx2149 ¶ 119);

(xiv)   Yet, as a large plan, the Plan had tremendous bargaining power to obtain the highest level of service while demanding low-cost administrative and management fees, including having the ability to obtain lower total per-participant fees rather than the excessive fees Defendants imprudently accepted for the Plan. (Appx2111 ¶ 7; Appx2120 ¶ 44; Appx2123 ¶ 51; Appx 2125-2127 ¶¶ 56-60; Appx2137-2138 ¶¶ 96-97);

(xv) For more than 10 years, Defendants failed to follow a prudent process to evaluate, negotiate, and monitor the Plan's Recordkeeping fees with Well Fargo:

    a) Defendants did not solicit competitive bids from other recordkeepers to investigate whether the Plan could obtain more competitive rates for Recordkeeping services from Wells Fargo or others for the same or higher quality services (Appx2132¶¶ 78-80; Appx2135-2136 ¶¶ 89-90; Appx2148-2150 ¶¶ 116, 122, 126);

    b) Defendants did not leverage the Plan's large size to negotiate or obtain Recordkeeping services for significantly lower fees than paid (Appx2150 ¶ 123);

    c) Defendants continued to pay excessive Recordkeeping fees as the Plan's assets increased with no corresponding increase in the level of services to the Plan (Appx2130 ¶ 73; Appx2148-2149 ¶¶ 118, 121);

    d) Defendants did not require Wells Fargo to rebate excessive fees year-after-year to Plan participants (Appx2136 ¶ 91; Appx2138-2139 ¶¶ 97-98; Appx2149 ¶ 120);

(xvi) Only in July 2020 did the Plan change its recordkeeper to Fidelity and then began paying $53 per participant in total Recordkeeping fees

(Appx2139 ¶ 98, n. 17; Appx2147 ¶ 114). The services provided by Fidelity were the same services previously provided by Wells Fargo Plan participants were not told that the level and quality of services provided by Fidelity were in any way inferior to those that had been provided by Wells Fargo, nor did they experience such a reduction (*Id.*);

These factual allegations more than plausibly raise the inference of imprudence. To survive a motion to dismiss, Plaintiffs need not "directly allege[] how [defendants] mismanaged the Plan," so long as there is "substantial circumstantial evidence from which the District Court could 'reasonably infer' that a breach had occurred.'" *Sweda*, 923 F.3d at 332 (quoting *Pension Benefit Guar. Corp. ex. rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)). "[C]ircumstantial evidence…'must provide a sound basis for comparison a meaningful benchmark to show a prudent fiduciary in like circumstances would have selected a different fund." *Pinnell v. Teva Pharms. USA, Inc.*, No. 19-cv-5738, 2020 U.S. Dist. LEXIS 55617, at *10 (E.D. Pa. Mar. 31, 2020) (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018).

This Court has found similar factual allegations in *Sweda* to be "numerous and specific" enough to plausibly allege a breach of fiduciary duty. *Sweda*, F.3d at 332. As here, the *Sweda* plaintiffs alleged that the plan excessively paid more than six times a reasonable recordkeeping fee than similar plans for the same services,

paying between \$4.5-\$5.5 million annually versus \$700,000-\$750,000.[12] *Id.* at 330. The plaintiffs alleged that defendants could have, but failed to, negotiate a cap on fees or renegotiate the fee structure, and assess the reasonableness of the plan's recordkeeping fees by soliciting competitive bids. *Id.*[13] The plaintiffs further alleged that percentage-based recordkeeping fees went up as assets grew, despite there being no corresponding increase in recordkeeping services. *Id.*[14] The plaintiffs offered examples of similarly situated fiduciaries for other University plans who acted prudently by requesting recordkeeping proposals and negotiating millions in revenue sharing rebates. *Id.* at 330-31.[15] Unlike the comparable plans, the plaintiffs alleged that defendants did not meet industry standard. *Id.*

Just as in *Sweda*, Plaintiffs here provided considerable circumstantial evidence from which the district court could have reasonably inferred Defendants breach of fiduciary duty. *Id.* at 332. Indeed, the district court recognized as much by stating, "courts have looked to factors such as whether a plan engages in competitive bidding for recordkeeping services, uses one or more recordkeepers, leverages its size to obtain reduced fees, and whether plaintiffs provide a 'meaningful benchmark'

---

[12] *Compare* Appx2137 ¶ 96; Appx2140-2141 ¶¶ 99-100, 102; Appx2143-2145 ¶¶ 105-108, stating the Plan paid between \$908,000 and \$1.5 million in total annual recordkeeping fees when similar plans paid between \$201,000 and \$526,000.

[13] *Compare* Appx2138-2139 ¶¶ 97-98; Appx2141 ¶ 100; Appx2148-2149 ¶¶ 115, 118, 120.

[14] *Compare* Appx2130 ¶ 73; Appx2148-2149 ¶¶ 118, 121.

[15] *Compare* Appx2133-2134 ¶¶ 83, 86; Appx2149 ¶ 120.

from which to measure a fiduciary's alleged imprudence." (Appx0018 (citing *Pinnell*, 2020 U.S. Dist. LEXIS 55617)). But the district court chose to overlook the very same factual allegations in Plaintiffs' Second Amended Complaint.

Instead, the district court erred in parsing the plausibility of Plaintiffs' claims on an allegation-by-allegation basis. First, the court suggests that Plaintiffs' allegations regarding Recordkeeping services do not "address the types or levels of services that any plan contracted to receive," and its purported "side by side list comparison" does not suffice….." (Appx0019-2020 (citing Appx0038)). "[W]ith no particularity as to the quality of services that Plan participants received Plaintiffs have engaged in a speculative fishing expedition" and "failed to "articulate what particular discovery would assist the parties and the Court" to assess the services provided. (Appx2020). However, "[f]or purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss. A prima facie case is an evidentiary standard, not a pleading requirement and hence is not a proper measure of whether a complaint fails to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788-89 (3d Cir 2016) (internal citations omitted).

Further, as stated above, Plaintiffs alleged in detail the type and scope of Recordkeeping services offered by the Plan's recordkeeper Wells Fargo (Appx2136-2137 ¶¶ 93-94), and that due to the nature and competitiveness of the market at the

top levels recordkeeping service for large plans, it would be reasonable to infer that similar services were offered by a) the Plan's subsequent recordkeeper Fidelity (Appx2147 ¶ 114); b) by Wells Fargo to other plans similar in asset and participant size (Appx2141 ¶ 102; Appx2143 ¶ 105), c) by other top national recordkeepers to plans similar in asset and participant size (Appx 2143 ¶105; Appx2144-2145 ¶¶ 107, 108), and that d) any minor variations in such recordkeeping services have no material impact of the fees charged (Appx2125 ¶ 54).

Plaintiffs' detailed allegations stand in stark contrast to out-of-Circuit authority relied on by the district court. In all of those cases, the NEPC survey was the sole benchmark identified for recordkeeping fees, and those cases do not support the district court's conclusion that the Plaintiffs' allegations are deficient. For example, in *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) the Sixth Circuit found that "Smith compares CommonSpirit's fees, for example, to some of the smallest plans on the market, which might offer fewer services and tools to plan participants. Smith has failed to allege that the fees were excessive relative to the services rendered. [She] also allege[s] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances." (citing *Young v. Gen. Motors Inv. Mgmt. Corp*. 325 F. App'x 31, 33 (2d Cir. 2009). In *Riley v. Olin Corp*., 2022 WL 2208953, (E.D. Mo. June 21, 2022) and *Perkins v. United Surgical Partners Int'l Inc*., 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022), the

district courts found that the NEPC survey alone was not a meaningful benchmark because it "does not contain any information about the services provided to the surveyed plans." *Olin*, 2022 WL 2208953 at *4.[16] Here, Plaintiffs do not rely solely on the NEPC survey, but have also compared the Plan to like sized plans using Wells Fargo and other national recordkeepers that pay substantially lower fees, have alleged the specific services provided to the Plan and the other plans, and have alleged there is no material difference in the nature and quality of those services.

Plaintiffs must be allowed to engage in discovery to uncover details of the exact services provided. The district court's "questions do not warrant dismissal to the contrary, they suggest the need for further information from both parties.'" *Davis v. Magna Int'l. of Am., Inc.*, 2021 U.S. Dist. LEXIS 62106, *20 (E.D. Mich. Mar. 31, 2021) (quoting *Nicholas v. Trustees of Princeton Univ.*, 2017 U.S. Dist. LEXIS 151775, *12 (D.N.J. Sept. 1, 2017). Plaintiffs lack detailed information "unless and until discovery commences." *Johnson*, 2022 U.S. Dist. LEXIS 60711, at *16-17 (internal quotations omitted). "While it may turn out that the terms of the recordkeeping arrangements were prudent under the circumstances, that is not the relevant inquiry at this juncture." *Id.* at *16-17 (citations omitted).

---

[16] *See also Matousek v. MidAmerican Energy Co.*, 751 F.4th 274, 280 (2022), which is also factually distinguishable where the court determined that the amount of the plan's $32 to $48 per participant recordkeeping fee "compares favorably with the proffered benchmarks."

Second, the district court erred in holding that "the comparator plans do not match the Plan relative to the number of participants or asset size, or the average of all other plans of similar size"…and that "[s]uch disparities raise serious doubts." (Appx0021-0022.) By doing so, the district court failed to "accept as true all of the factual allegations contained in the complaint" construing it in the light most favorable to the plaintiff, *Twombly*, 550 U.S. at 572, and instead weighed the underlying evidence to make a factual determination in favor of defendants. The district court's analysis was limited to cherry-picking the Second Amended Complaint's detailed allegations regarding comparator plans by suggesting that solely because "at least one comparator [plan], Centerpoint/Voya, did not have the same list of [Form 5500 service list] codes relative to services as Wells Fargo did for the Plan," that it necessarily was not an apt comparison. (Appx0022.) In other words, the district court speculated that Centerpoint/Voya provided superior services than those provided by Wells Fargo and made the factual determination that paying more for superior Recordkeeping services must be more prudent than paying less for inferior services. However, these are exactly the type of factual questions that are improper to analyze at the pleadings stage. Even if their truth seems doubtful, "Rule 12(b)(6) does not countenance…dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted); *see also Nicholas*, 2017 U.S. Dist. LEXIS 151775, at *12 ("Defendant

raises factual questions about whether the alternative funds Plaintiff suggests are apt comparisons…[s]uch questions do not warrant dismissal—to the contrary, they suggest the need for further information from both parties."); *Pinnell*, 2020 U.S. Dist. LEXIS 55617, at *14-15 ("Defendants also attack the accuracy of some of the participants' comparisons to alternative funds. But we cannot resolve factual disputes at the motion to dismiss stage…This factual disagreement points to the need for discovery."). Moreover, the district court not only ignored that all the other comparator plans provided the same level of services as Wells Fargo, but also ignored and failed to acknowledge the glaring *commonality* that all of the comparator plans, regardless of the number of assets or participants, paid similar total Recordkeeping services fees within a reasonable range that is multiple times less than the fees paid by the Plan.

As mentioned above, in dismissing the Amended complaint, the district court relied on the *Johnson I* decision by a fellow Judge in the Western District of Pennsylvania. In *Johnson I*, the operative complaint did not identify any comparator plans like Plaintiffs did here; rather, the complaint underlying the *Johnson I* decision simply relied on the 401k Averages Book. *Johnson I*, 2021 U.S. Dist. LEXIS 149408, at *5-6. Thereafter the *Johnson* plaintiffs filed an amended complaint that included comparator plans, just like Plaintiffs' complaints here (notably, the amended complaint underlying the *Johnson II* decision listed only four comparator

plans, compared to the sixteen comparator plans identified by Plaintiffs.) *Johnson II*, 2022 U.S. Dist. LEXIS 60711, at \*4-6. The *Johnson II* court, faced with similar arguments raised by Defendants here, found that the four comparator plans, that used the same recordkeeper as the plan, and that paid substantially lower fees, established a meaningful benchmark. *Johnson II*, 2022 U.S. Dist. LEXIS 60711, at \*15-18 (plaintiffs sufficiently alleged defendants breached their duty of prudence where "the Plan's average per participant, per year recordkeeping fee of $52.58 is unreasonable and excessive relative to the services received[,] especially when compared to the four other 401(k) plans noted within the Plaintiffs' benchmark table.") (internal quotation omitted).[17] Here, the Court can conclude, *at a minimum*, that Plaintiffs

---

[17] In *Mator II*, the district court acknowledged that "[p]laintiffs' counsel's reliance on *Johnson II* is understandable" but attempted to distinguish it by speculating, without *any* basis or support in the record in *Johnson I* or *II*, or in this case, that "the plaintiffs [in *Johnson*] had exhausted investigatory avenues at the pleading stage" by obtaining the recordkeeping agreement from defendants before filing suit. (Appx0039.) That speculation was not only improper at the pleadings stage, but also was flat-out wrong. Plaintiffs' counsel here easily verified that the inaccuracy of the district court's speculation, and added allegations in the Second Amended Complaint that a) the *Johnson* plaintiffs "did not have a copy of the service agreement," and b) that the district court's view that Plaintiffs could have procured a copy of the Wells Fargo agreement with the Wesco Plan via 29 U.S.C. § 1024(b)(4) was also wrong. (Appx2113). Notably, despite relying on its misguided speculation to distinguish *Johnson II* in dismissing the First Amended Complaint, the district simply ignored the issue in dismissing the Second Amended Complaint in *Mator III*. Notably, Defendants could have eliminated all speculation by simply submitting a copy of the Wells Fargo agreement as part of their request for judicial notice in support of their motion to dismiss, just like they submitted various other documents incorporated by reference in Plaintiffs' complaints.

have sufficiently pled a meaningful benchmark based on the five comparable plans that use the *same* recordkeeper.

Third, the district court erroneously held that Plaintiffs must plead "additional details as to fee structures and services provided" in order to plausibly state a claim. (Appx0023.) In doing so, the court further parsed the Complaint by suggesting that two out of the sixteen comparator plans are mistakenly calculated. (Appx0022.) That was incorrect. Plaintiffs clearly set forth their methodology in determining the total direct and indirect recordkeeping fees for all comparator plans using information reflected in Form 5500 reports filed by those comparator plans with the Department of Labor, as well as the accompanying audited financial statements and notes, fund prospectuses and publicly available revenue sharing rates. (Appx2141-2143 ¶ 102, n. 21; ¶ 103; ¶ 106, n. 22, 23.)[18] Further, the district court incorrectly assumed that a plan that had no *excess* indirect compensation to rebate to its participants did not pay indirect compensation at all. (Appx0022). Even assuming, *arguendo*, that the court were correct in concluding that Plaintiffs' calculations for the two comparator plans were wrong, a district court may not "weigh[] the credibility of the parties' positions" on "a question of disputed material fact[] at the motion to dismiss stage,

---

[18] Plaintiffs calculated the Plan's recordkeeping fees based on exhibits 12-15 to defendants' motion to dismiss (Appx1193-1213), which set out the percentage of each asset-based fees charged by Wells Fargo, and the Plan's Form 5500s. (Appx2138-2140 ¶ 97, n. 16; ¶ 98, n. 19; ¶ 99, n.20).

but rather should ... le[ave] such considerations to a jury." *Bagic v. Univ. of Pittsburgh*, 773 Fed. Appx. 84, 87 (3d Cir. June 11, 2019) (quoting *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 97 (3d Cir. 1999)). Requiring plaintiffs to know and aver granular levels of detail about Recordkeeping services about the Plan or in comparison to any other similar plan without the benefit of discovery, is not only impossible, but also contrary to *Tibble*, *Hughes*, and *Sweda*. Such questions should not be resolved on a motion to dismiss.

## IV. Plaintiffs' Plausibly Alleged Defendants Breached Their Fiduciary Duties By Imprudently Failing to Monitor the Plan's Recordkeeping Fees and to Investigate Lower-Cost Share Class Options

The Third Circuit has made it clear that "[f]iduciaries must [] understand and monitor plan expenses" because "'[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan,' *Tibble III*, 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. The district court held that Plaintiffs' claims for breach of the duty to monitor is derivative of the claims for breach of the duty of prudence, and therefore fails. (Appx0024.)

Courts in the Third Circuit, among many others, have interpreted ERISA to hold that there is a duty to monitor appointed fiduciaries. See *Perez v. WPN Corp.*, No. 14-1494, 2017 U.S. Dist. LEXIS 87530, *35 (W.D. Pa. June 7, 2017) (holding

that "[t]he power to appoint and dismiss an investment fiduciary carries with it a duty to monitor appropriately those subject to removal") (citations omitted) (collecting cases).

Here, Plaintiffs well-pled allegations include that the Defendants failed to carry out their duty to monitor the Plan's Recordkeeping fees and investment options by:

(i)     failing to monitor the amount of indirect compensation paid by the Plan to its recordkeeper (Appx2148 ¶ 115);

(ii)    failing to monitor the Plan's Recordkeeping fees to assure they were a reasonable size for the Plan (Appx 2149 ¶ 119);

(iii)   failing to monitor the Plan's Recordkeeping fees and require Wells Fargo to rebate the excessive fees to the Plan or Plan participants (Appx 2149 ¶ 120);

(iv)    failing to monitor the process by which Wells Fargo was evaluated and failing to investigate the availability of lower-cost providers, such as by issuing a request for proposals from other providers (Appx2150 ¶ 128; Appx2155 ¶ 142); and

(v)     failing to properly monitor the Plan's investment options and remove imprudent ones (Appx2151 ¶ 130; Appx2153 ¶ 135).

The *Johnson II* court's holding is, again, instructive. The court rejected an argument by defendants that the complaint was deficient in lacking "factual allegations about [defendant's] monitoring process" and held that "based on the Defendants' roles (i.e., an employer, a Savings Plan Administrative Committee, and its respective members), the facts here provide a sufficient basis to infer that Defendants knew or should have known about alleged mismanagement." *Johnson II*, 2022 U.S. Dist. LEXIS 60711, at *23-24.

Given all the Complaint's well-pled allegations discussed above taken as a whole and not parsed piece by piece Plaintiffs have created the plausible inference that Defendants breached their fiduciary duties. "At this stage of the pleadings there is no record on which to evaluate the conduct of the Defendants . . . Further discovery is needed to establish exactly what efforts, if any, were made by Defendants in furtherance of their fiduciary duties." *Perez*, 2017 U.S. Dist. LEXIS at *41-42.

## CONCLUSION

Plaintiffs' allegations are at least as robust, if not more robust than the allegations in *Sweda*, and the allegations upheld by the Second, Sixth, Eighth and Ninth Circuits in *Tibble, Sacerdote, Kong, Davis v. Salesforce,* and *Davis v. Washington University*. Because the district court here failed to follow the binding precedent in *Sweda* and ignored the similar holdings by at least four other Circuits, applied the wrong legal standard, and improperly weighed the parties' competing

evidence, Plaintiffs respectfully request this Court to reverse the district court's dismissal of the SAC and remand this case so it may proceed to the discovery stage.

Dated:  November 23, 2022

Respectfully submitted,

CHIMICLES SCHWARTZ KRINER
  & DONALDSON-SMITH LLP

  */s/ Steven A. Schwartz*
Steven A. Schwartz
steveschwartz@chimicles.com
Beena M. McDonald
bmm@chimicles.com
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Fax: (610) 649-3633

Paul R. Wood, Esquire
woodp@fdazar.com
Timothy Foster, Esquire
fostert@fdazar.com
FRANKLIN D. AZAR
  & ASSOCIATES, P.C.
14426 E. Evans Avenue
Aurora, CO  80015
Phone: (303) 757-3300

*Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I certify that I am a member in good standing of the Bar for the United States Court of Appeals for the Third Circuit.

I further certify that the text of the electronic brief filed by ECF and the text of the hard copies filed or to be filed with the Court are identical.

The electronic copy of the brief has been scanned for viruses using Carbon Black.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,889 words as calculated by the word processing program used in the preparation of this brief, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2019 and Times New Roman 14-point font.

Dated:  November 23, 2022         */s/ Steven A. Schwartz*_____
                                   Steven A. Schwartz

## **CERTIFICATE OF SERVICE**

I, Steven A. Schwartz, hereby certify that on November 23, 2022, the foregoing BRIEF FOR PLAINTIFFS-APPELLANTS was served electronically, by consent, on all counsel of record via email, and that it is available for viewing on and downloading from the CM/ECF system.


Dated:  November 23, 2022                    *Steven A. Schwartz*
                                             Steven A. Schwartz