**No. 22-2552**

# In the United States Court of Appeals
## FOR THE THIRD CIRCUIT

ROBERT MATOR; NANCY MATOR, individually and as representatives of a class of participants and beneficiaries in and on behalf of WESCO Distribution, Inc. Retirement Savings Plan,

*Plaintiffs-Appellants*

v.

WESCO DISTRIBUTION, INC.; THE ADMINISTRATIVE AND INVESTMENT COMMITTEE FOR WESCO DISTRIBUTION, INC. RETIREMENT SAVINGS PLAN; JOHN AND JANE DOES 1-30,

*Defendants-Appellees*

On Appeal from the United States District Court
for the Western District of Pennsylvania
No. 2:21-cv-00403 (Hon. Marilyn J. Horan)

## BRIEF OF APPELLEES

Deborah S. Davidson
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1000

Stephanie R. Reiss
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, 32nd Floor
Pittsburgh, PA 15219
(412) 560-3300

Matthew J. Sharbaugh
Michael E. Kenneally
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

*Counsel for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit Local Appellate Rule 26.1, Appellees WESCO Distribution, Inc. and the Administrative and Investment Committee for the WESCO Distribution, Inc. Retirement Savings Plan make the following disclosure:

(1)     For nongovernmental corporate parties, please list all parent corporations:

*WESCO International, Inc.*

(2)     For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*No publicly held company owns 10% or more of WESCO International, Inc.'s stock.*

(3)     If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*Not applicable.*

(4)     In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the

case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

*Not applicable.*

Dated:  January 23, 2023                s/ Matthew J. Sharbaugh

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF CITATIONS ......................................................... v

INTRODUCTION .................................................................. 1

STATEMENT OF ISSUES ...................................................... 4

STATEMENT OF RELATED CASES & PROCEEDINGS ................... 5

STATEMENT OF THE CASE .................................................. 5

I.    Statutory Background ................................................... 5

II.   Factual Background ..................................................... 6

    A.    WESCO's Retirement Plan ...................................... 6

    B.    Plan Fees and Expenses ......................................... 8

    C.    The Plan's Recordkeeping ..................................... 10

III.  Procedural History ...................................................... 12

    A.    Plaintiffs' Allegations .......................................... 12

    B.    The District Court's Rulings ................................... 16

SUMMARY OF ARGUMENT .................................................. 18

STANDARD OF REVIEW ...................................................... 19

ARGUMENT ...................................................................... 22

I.    The District Court correctly held that Count I of the Second
    Amended Complaint fails to state a plausible claim based on
    purportedly excessive fees ............................................. 22

    A.    Plaintiffs failed to adequately allege that the Plan's
        fees for recordkeeping and administrative services
        raise an inference of an imprudent fiduciary process ..... 26

        1.    Plaintiffs' allegations show that WESCO
            actively monitored and succeeded in
            reducing the Plan's recordkeeping and
            administrative fees ......................................... 26

# TABLE OF CONTENTS
## (continued)

**Page**

       2.    Courts have widely rejected Plaintiffs' threadbare and conclusory allegations.............. 29

       3.    Flaws in Plaintiffs' comparisons further undermine their attempt to state a claim. ........ 36

   B.    Plaintiffs failed to adequately allege that the Plan's retail-class investment options raise an inference of an imprudent fiduciary process. ............................................... 43

   C.    Plaintiffs' assorted objections to the District Court's ruling lack merit and provide no basis for reversal. ........... 50

II.   The District Court correctly held that Count II of the Second Amended Complaint fails to state a plausible claim based on monitoring other fiduciaries because it is derivative of Count I..................................................................................... 55

CONCLUSION ....................................................................... 56

COMBINED CERTIFICATES OF COMPLIANCE.............................. 58

# TABLE OF CITATIONS

**Page(s)**

CASES

*Aetna Health Inc. v. Davila,*
    542 U.S. 200 (2004) ...................................................................5

*Albert v. Oshkosh Corp.,*
    47 F.4th 570 (7th Cir. 2022) ...................................... *passim*

*Albert v. Oshkosh Corp.,*
    No. 20-cv-901, 2021 WL 3932029 (E.D. Wis. Sept. 2, 2021) .............38

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................ 20, 21, 33, 50

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................ 20, 21, 50, 51

*Brown v. Daikin Am., Inc.,*
    No. 18-cv-11091, 2021 WL 1758898 (S.D.N.Y. May 4, 2021)............49

*Conkright v. Frommert,*
    559 U.S. 506 (2010) ...................................................................5

*Cunningham v. USI Ins. Servs., Inc.,*
    No. 21-cv-1819, 2022 WL 889164 (S.D.N.Y. Mar. 25, 2022) .............41

*Davis v. Salesforce.com, Inc.,*
    No. 21-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022) ...................46

*Davis v. Wash. Univ. in St. Louis,*
    960 F.3d 478 (8th Cir. 2020) ...........................................................42

*DeBruyne v. Equitable Life Assur. Soc. of U.S.,*
    920 F.2d 457 (7th Cir. 1990) ...........................................................23

*Edgar v. Avaya, Inc.,*
    503 F.3d 340 (3d Cir. 2007) ...........................................................56

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Fifth Third Bancorp v. Dudenhoeffer,*
  573 U.S. 409 (2014) ........................................................................ 6, 21

*Forman v. TriHealth, Inc.,*
  40 F.4th 443 (6th Cir. 2022) ................................................. 30, 31, 46

*Gonzalez v. Northwell Health,*
  No. 20-cv-3256, 2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022) ........... 32

*Hughes v. Nw. Univ.,*
  142 S. Ct. 737 (2022) ................................................................ *passim*

*In re Allergan ERISA Litig.,*
  975 F.3d 348 (3d Cir. 2020) .............................................................. 55

*In re Unisys Sav. Plan Litig.,*
  74 F.3d 420 (3d Cir. 1996) ............................................................... 22

*Johnson v. PNC Fin. Servs. Grp., Inc.,*
  No. 20-cv-1493, 2021 WL 3417843 (W.D. Pa. Aug. 3, 2021) .............. 50

*Kong v. Trader Joe's Co.,*
  No. 20-56415, 2022 WL 1125667 (9th Cir. Apr. 15, 2022) ................. 46

*Krutchen v. Ricoh USA, Inc.,*
  No. 22-cv-678, 2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ....... 31, 39

*Kurtz v. Vail Corp.,*
  511 F. Supp. 3d 1185 (D. Colo. 2021) ................................................ 49

*LaRue v. DeWolff, Boberg & Assocs., Inc.,*
  552 U.S. 248 (2008) ............................................................................ 7

*Leimkuehler v. Am. United Life Ins. Co.,*
  713 F.3d 905 (7th Cir. 2013) ......................................................... 9, 10

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011) ........................................................ 10, 49

*Matney v. Barrick Gold of N. Am., Inc.*,
  No. 20-cv-275, 2022 WL 1186532 (D. Utah Apr. 21, 2022) .......... 27, 29

*Matousek v. MidAmerican Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ...................................................... *passim*

*Mazo v. N.J. Sec'y of State*,
  54 F.4th 124 (3d Cir. 2022) ................................................................ 19

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ........................................................ 23, 24

*Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs.
  Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc. (St. Vincent)*,
  712 F.3d 705 (2d Cir. 2013) ....................................................... *passim*

*Perkins v. United Surgical Partners Int'l Inc.*,
  No. 21-cv-973, 2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ......... 31, 39

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ............................................................... 25

*Riley v. Olin Corp.*,
  No. 21-cv-1328, 2022 WL 2208953 (E.D. Mo. June 21, 2022) ............ 32

*Rinehart v. Lehman Bros. Holdings Inc.*,
  817 F.3d 56 (2d Cir. 2016) ................................................................. 56

*Sacerdote v. N.Y. Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018) ................................................. 34

*Sacerdote v. N.Y. Univ.*,
  9 F.4th 95 (2d Cir. 2021) ............................................................. 47, 49

# TABLE OF CITATIONS
(continued)

**Page(s)**

*Singh v. Deloitte LLP,*
No. 21-cv-8458, 2023 WL 186679 (S.D.N.Y. Jan. 13, 2023)......... 31, 35

*Smith v. CommonSpirit Health,*
37 F.4th 1160 (6th Cir. 2022) ..................................................... *passim*

*Spear v. Fenkell,*
No. 13-02391, 2015 WL 3643571 (E.D. Pa. June 12, 2015) ............... 56

*Sweda v. Univ. of Pa.,*
923 F.3d 320 (3d Cir. 2019) ....................................................... *passim*

*Tibble v. Edison Int'l,*
575 U.S. 523 (2015)............................................................................... 27

*Watters v. Bd. of Sch. Dirs. of City of Scranton,*
975 F.3d 406 (3d Cir. 2020) ............................................................... 19

*Wehner v. Genentech,*
No. 20-cv-6894, 2021 WL 507599 (N.D. Cal. Feb. 9, 2021)................ 41

*White v. Chevron Corp.* (*White I*),
No. 16-cv-793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ....... 27, 28

*White v. Chevron Corp.* (*White II*),
No. 16-cv-793, 2017 WL 2352137 (N.D. Cal. May 31, 2017).............. 49

*White v. Chevron Corp.* (*White III*),
752 F. App'x 453 (9th Cir. 2018)........................................................ 25

*Young v. Gen. Motors Inv. Mgmt. Corp.,*
325 F. App'x 31 (2d Cir. 2009) ........................................................... 30

# TABLE OF CITATIONS
(continued)

**Page(s)**

**STATUTES**

Employee Retirement Income Security Act
    29 U.S.C. § 1001, *et seq.* ............................................................ *passim*
    29 U.S.C. § 1002 ............................................................................ 7
    29 U.S.C. § 1104 .............................................................. 6, 13, 22
    29 U.S.C. § 1109 ...................................................................... 6, 12
    29 U.S.C. § 1132 ...................................................................... 6, 12

**RULES**

Fed. R. Civ. P. 12 ............................................................... 19, 20

Fed. R. Evid. 407 ..................................................................... 28

**OTHER AUTHORITIES**

*Defined Contribution Progress Report,*
    https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20P
    lan%20and%20Fee%20Survey%20(progress%20report)/20
    19%20NEPC%20DC%20Plan%20Progress%20Report.pdf ............... 39

Investment Company Institute, *401(k) Resource Center*
    (2022), https://www.ici.org/401k ....................................... 13

U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* (Sept. 2019),
    https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-
    activities/resource-center/publications/a-look-at-401k-
    plan-fees.pdf ....................................................................... 24

U.S. Dep't of Labor, *Tips for Selecting and Monitoring
    Service Providers for Your Employee Benefit Plan,*
    https://www.dol.gov/sites/dolgov/files/EBSA/about-
    ebsa/our-activities/resource-center/fact-sheets/tips-for-
    selecting-and-monitoring-service-providers.pdf ................................ 24

**TABLE OF CITATIONS**
(continued)

**Page(s)**

U.S. Dep't of Labor, *Understanding Retirement Plan Fees
    and Expenses* (Sept. 2021), https://www.dol.gov/sites/
    dolgov/files/EBSA/about-ebsa/our-activities/resource-
    center/publications/understanding-retirement-plan-fees-
    and-expenses.pdf............................................................................ 8, 35

# INTRODUCTION

This case is part of a wave of litigation under the Employee Retirement Income Security Act ("ERISA") accusing retirement plan fiduciaries of breaching their statutory duties to prudently manage their plans. The targets here are The WESCO Distribution, Inc. Retirement Savings Plan (the "Plan") and Defendants WESCO Distribution, Inc. and the Administrative and Investment Committee for the Plan (together, "WESCO"). This case differs from many others, however, because Plaintiffs do not challenge the performance or scope of the Plan's investments. Rather, Plaintiffs allege that WESCO breached its fiduciary duty of prudence by permitting the Plan to pay more than what Plaintiffs consider to be "reasonable" fees for costs associated with managing and administering the recordkeeping services that WESCO negotiated for the Plan. Plaintiffs additionally allege that WESCO imprudently selected certain "retail" share-class investment options for the Plan lineup for the acknowledged purpose of paying those recordkeeping costs.

The District Court properly held that Plaintiffs' allegations—after three attempts—failed to state any plausible claim for relief. When an ERISA retirement plan participant challenges the level of fees paid to a

plan's service provider, authority from numerous courts holds that the participant must allege that those fees are "excessive relative to the services rendered." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (citation omitted) (affirming dismissal of such allegations); *see also, e.g.*, *Albert v. Oshkosh Corp.*, 47 F.4th 570, 580 (7th Cir. 2022) (same), *reh'g denied*, No. 21-278, 2022 WL 4372363 (7th Cir. Sept. 21, 2022); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) (same). That makes sense because, as the Supreme Court recently explained, retirement-plan management often involves "tradeoffs" and leaves room for a "range of reasonable judgments" on the part of the plan's fiduciaries. *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). Minimizing plan costs is not the only reasonable objective or consideration facing fiduciaries; paying higher fees can be warranted, for instance, for the sake of obtaining different types and levels of services for a plan and its participants. In keeping with these principles, the District Court rightly recognized that Plaintiffs' Second Amended Complaint fails to plead the necessary facts to show that WESCO allowed the Plan to pay an unreasonable amount relative to the services that the Plan received from its recordkeeper.

Given this failure, Plaintiffs switch gears on appeal. They now lead with their allegation that the Plan should not have included "retail class" versions of certain investment options, which charge higher up-front fees than their "institutional class" counterparts. Several courts have allowed such claims to proceed when the pleadings supported an inference that including those retail-class funds was the product of imprudent fiduciary decision-making. But as the District Court observed, there is no categorical prohibition on including retail-class investment options in a retirement plan lineup. And here, the Second Amended Complaint itself pleads a prudent and reasonable explanation for the inclusion of these investment options: the incrementally higher fees they generated were used to pay the costs of the Plan's recordkeeper through a process called "revenue sharing." Moreover, WESCO arranged for Plan participants to receive rebates of excess fees collecting through revenue sharing. Given Plaintiffs' revenue-sharing allegations, their version of this "retail class" claim hinges on their ability to plausibly show that the Plan's recordkeeping fees were excessive. But again, without the necessary allegations about the services those fees procured (among other fatal shortcomings with their allegations), that challenge fails.

In sum, Plaintiffs have not adequately alleged a breach of ERISA's fiduciary duty of prudence, and the District Court's dismissal of their action should be affirmed in full.

## STATEMENT OF ISSUES

1.    Whether the District Court properly held that the Second Amended Complaint fails to plausibly state a claim for breach of ERISA's duty of prudence based on the Plan's allegedly paying more fees to its service provider for recordkeeping and administrative services, in a single year of the relevant period, than a handful of other plans allegedly paid for recordkeeping and administrative services.

2.    Whether the District Court properly held that the Second Amended Complaint fails to plausibly state a claim for breach of ERISA's duty of prudence based on the Plan's offering some investment options in higher-cost "retail" share classes, instead of lowest-cost "institutional" share classes, when Plaintiffs expressly allege and acknowledge that the incremental fee differences were used for revenue sharing to pay for the Plan's recordkeeping and administrative services.

3.    Whether the District Court properly held that the Second Amended Complaint fails to plausibly state a claim for failure to monitor co-fiduciaries based on the same allegations.

## STATEMENT OF RELATED CASES & PROCEEDINGS

This case has not previously been before this Court, and WESCO is not aware of any other case or proceeding that is in any way related, completed, pending, or about to be presented before this Court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

### I.    Statutory Background

ERISA is "a comprehensive statute for the regulation of employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Like most statutes, it reflects a "careful balancing" of competing aims. *Id.* at 215 (citation omitted).  Congress wanted ERISA to help ensure that employees receive the benefits they earned. *Conkright v. Frommert*, 559 U.S. 506, 516 (2010).  But Congress did not want a regime "so complex that administrative costs, or litigation expenses, unduly discourage employers from offering ERISA plans in the first place." *Id.* at 517 (citation and brackets omitted).  These "competing congressional purposes" are both important in understanding the scope of ERISA's fiduciary duties.

5

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (citation omitted).

Under ERISA's duty of prudence, a plan fiduciary must "discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Fiduciaries are "personally liable" if they breach this duty and must make good any losses that they cause to the plan. *Id.* § 1109(a). Plan participants and beneficiaries (among others) have a cause of action to seek appropriate relief for such fiduciary breaches. *Id.* § 1132(a)(2)-(3).

## II.    Factual Background

### A.    WESCO's Retirement Plan

WESCO offers its employees a range of benefits, including the ability to save for retirement through the Plan. The Plan is an individual-account, defined-contribution plan under ERISA. Appx2111 (SAC ¶ 7). This type of plan "promises the participant the value of an individual

account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 250 n.1 (2008); *see* 29 U.S.C. § 1002(34).   Participants choose how to invest the assets in their individual accounts by choosing from a menu of options selected by plan fiduciaries.   *See, e.g.*, *Hughes*, 142 S. Ct. at 740.

The Plan allows employees to save for retirement on a tax-deferred basis, with WESCO adding to those retirement savings through matching contributions.   Between 2015 and 2020, WESCO made over $87 million in matching contributions for Plan participants.   Appx2279 ($9,013,325 in 2015); Appx2324 ($10,364,792 in 2016); Appx2366 ($19,896,481 in 2017); Appx2406 ($31,125,052 in 2018); Appx2447 ($12,319,253 in 2019); Appx2725 ($5,061,157 in 2020).

Throughout the putative class period, the Plan offered a diverse menu of almost 50 different investment options (with at least 25 offered at any given time) that cover different asset classes (*e.g.*, stocks, bonds, stable-value options), investment styles (including both actively managed funds and passive "index" funds), and risk-reward profiles.   *See, e.g.*, Appx2200-48.   Participants also could (and still can) select from many

other options through a self-directed brokerage investment account. Appx2200; Appx2206; Appx2212; Appx2218; Appx2225; Appx2240.

### B.    Plan Fees and Expenses

There are expenses associated with any retirement plan. These include: (1) investment-management fees, which are "ongoing charges for managing the assets of [each] investment fund"; and (2) recordkeeping or administrative fees, which cover "day-to-day" expenses for the "basic administrative services . . . necessary for administering the plan" and potentially other services, too, like "access to a customer service representative" and "electronic access to plan information." U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* 2-3 (Sept. 2021), https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf; *see also* Appx2120 (SAC ¶ 42).

Retirement plans generally pay for some of these expenses through the "expense ratios" charged by the plans' investment options. *See* Appx2127-28 (SAC ¶ 63). An expense ratio is a percentage-based deduction from the amounts that a participant holds in a particular investment option. For instance, if a participant invests $1,000 in a mutual fund

8

with an expense ratio of 0.10%, the mutual fund collects an annual fee of $1 ($1,000 x 0.001) from the participant. An expense ratio is sometimes expressed in "basis points," with one basis point equaling 1/100th of 1%, or 0.01%. A 0.10% expense ratio, for example, equals 10 basis points.

Some of the fees collected through an investment's expense ratio go to the investment manager to pay for investment-management fees. And sometimes, through a practice known as "revenue sharing," another portion goes to the plan recordkeeper to pay for administrative services. *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013); *see also* Appx2131 (SAC ¶ 74) (stating that in a revenue-sharing arrangement, a mutual fund directs a portion of the expense ratio to the plan's recordkeeper to pay for recordkeeping and administrative services). For instance, if an investment's expense ratio is 0.75%, the investment manager could pay, or "share," a portion of the 0.75% fee, or "revenue," it collects with the plan's recordkeeper for the administrative services that the recordkeeper provides. *See* Appx2128 (SAC ¶ 66).

Some investment options offer multiple "share classes" that charge different fees. With a "retail" share class, for example, investors pay the

same fees as the general public; in contrast, an investor in an "institutional" share class of the same investment option, which is typically reserved for larger institutional investors, pays a slightly lower expense ratio. *See, e.g.*, *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011); Appx2128 (SAC ¶ 64). "As a general matter, expense ratios and revenue-sharing payments move in tandem: the higher a given share class's expense ratio, the more the fund pays [the recordkeeper] in revenue sharing." *Leimkuehler*, 713 F.3d at 909; *see also* Appx2153 (SAC ¶ 137 & n.31).

Apart from revenue sharing, a plan can also compensate recordkeepers directly from plan assets. Appx2130 (SAC ¶ 71). A recordkeeper's total compensation can come from a combination of such direct compensation and indirect compensation through revenue sharing. *Id.*

### C.    The Plan's Recordkeeping

At the start of the putative class period (in March 2015) and until mid-2020, the Plan's recordkeeper was Wells Fargo Bank, N.A. ("Wells Fargo"). Appx2136 (SAC ¶ 93). The Plan paid for recordkeeping and certain other administrative expenses through an ERISA account funded by

10

revenue sharing. *See* Appx2114-15 (SAC ¶¶ 20, 25) (alleging that Plaintiffs held Plan investments that paid revenue-sharing fees); Appx2462 (noting on fee schedule that administration fees were derived from annual asset-based fees); Appx2468 (same); Appx2474 (same).

Although not all funds in the Plan participated in revenue sharing, certain funds contributed a portion of the investment-management fees to the ERISA account, in percentages ranging from 0.05% to 0.35%. *See* Appx2463-64 (reflecting revenue sharing in "Asset Based Fees Paid by Fund" column); Appx2469-70 (same); Appx2475-76 (same). Wells Fargo charged recordkeeping fees to the Plan from the ERISA account that were calculated as a percentage of assets under management. Over time, WESCO steadily negotiated Wells Fargo's percentage fee downward, as reflected in the following chart:

| Effective Date | Old Recordkeeping Fee | New Recordkeeping Fee |
| --- | --- | --- |
| January 1, 2015 | 14 bps | 11 bps |
| July 1, 2017 | 11 bps | 9.5 bps |
| October 1, 2018 | 9.5 bps | 6 bps |

*See* Appx2479 (reflecting 14 bps recordkeeping fee in "Asset Based Wrap Fees" column); Appx2463-64 (11 bps recordkeeping fee); Appx2469-70 (9.5 bps recordkeeping fee); Appx2475-76 (6 bps recordkeeping fee).

In 2018 and 2019, Wells Fargo determined that "a portion of the revenue sharing dollars were not needed to pay for administrative and recordkeeping costs," and WESCO arranged to have excess revenue-sharing payments paid back to participants through a credit posted in their Plan accounts. *See* Appx2481; Appx2483; *cf.* Appx0835 (FAC ¶ 100 n.13).

Effective July 1, 2020, the Plan changed recordkeepers from Wells Fargo to Fidelity Investments ("Fidelity"). Appx2147 (SAC ¶ 114). As a result of this change, participants started to pay a flat annual record-keeping fee of $53 per participant. *Id.*; s*ee also* Appx2241. The investment options with revenue sharing that remain in the Plan now fully rebate these revenue-sharing amounts back to the participants on a quarterly basis. *See* Appx2487 (describing participant revenue credits).

## III.  Procedural History

### A.    Plaintiffs' Allegations

Plaintiffs filed this putative class action in March 2021. Appx0064. According to the Second Amended Complaint, they are participants in the Plan who have paid excessive "RPS" or "retirement plan services" fees. Appx2113-15 (SAC ¶¶ 19, 24). From the start, they have asserted two claims for relief under 29 U.S.C. §§ 1109 and 1132(a)(2)-(3): one claim

for alleged breach of ERISA's fiduciary duty of prudence (Count I), and one claim for alleged failure to monitor other fiduciaries' performance (Count II).  Appx2159-63 (SAC ¶¶ 154-74); *see also* Appx0107-12 (Compl. ¶¶ 124-44); Appx0853-57 (FAC ¶¶ 150-70).  They assert these claims on behalf of a proposed class of all Plan participants and beneficiaries from March 26, 2015 through the date of judgment.  Appx2156 (SAC ¶ 144).[1]

Plaintiffs contend that WESCO breached its duty of prudence because the Plan allegedly paid more for recordkeeping services than sixteen other plans—out of the hundreds of thousands of other 401(k) plans in the country—paid in 2018.  Appx2142-44 (SAC ¶¶ 102, 106); *see* Investment Company Institute, *401(k) Resource Center* (2022), https://www.ici.org/401k (estimating that there were 600,000 401(k) plans as of September 30, 2021).

In making this allegation, Plaintiffs rely on their interpretation of the Plan's agreement with Wells Fargo, in addition to public Form 5500

---

[1] Based on the allegations in their original complaint, it was unclear whether Plaintiffs were also asserting a claim for breach of ERISA's duty of loyalty, 29 U.S.C. § 1104(a)(1)(A).  In response to WESCO's first motion to dismiss, Plaintiffs disclaimed any such theory, and so the District Court held any disloyalty claim to be "withdrawn." Appx47 n.1.  Plaintiffs do not challenge that ruling on appeal.

disclosures for the Plan and Plaintiffs' alleged comparators. Appx2138-43 (SAC ¶¶ 97-106 & nn.16-23).[2] By design, however, the Form 5500 asks plans to disclose the amount of *direct* compensation paid to a record-keeper and whether the recordkeeper also received "eligible *indirect* compensation," but it does not ask plans to disclose the amount of "eligible indirect compensation" or the recordkeeper's total compensation. For the WESCO Plan, Plaintiffs purported to combine the direct and indirect compensation that Wells Fargo received between 2014 and 2018 using their interpretation of the rates in the Wells Fargo agreement. Appx2138-40 (SAC ¶¶ 97-99 & nn.16-19). But Plaintiffs cannot duplicate that process for their comparator plans, which do not disclose their revenue-sharing rates on the public Form 5500 disclosures on which Plaintiffs rely. *See, e.g.*, Appx2530-67 (Carlisle 2018 Form 5500); Appx2569-605 (HealthFirst 2018 Form 5500); Appx2607-42 (Rackspace 2018 Form 5500); Appx2644-82 (Boston Consulting Group 2018 Form 5500). And for two comparators, Plaintiffs inexplicably do not even try to include indirect compensation, even though those plans' Form 5500 disclosures, like the Plan's, state that their recordkeepers received indirect compensation.

---

[2] The Form 5500 is an annual filing required by the U.S. Department of Labor that reports on some plan-related financial information.

*Compare* Appx2141-42, Appx2143-44 (SAC ¶¶ 102, 106), *with* Appx2748 (Edward-Elmhurst Healthcare Retirement Savings Plan), *and* Appx2807 (Red Lobster 401(k) Plan).

Although Plaintiffs identify the recordkeepers for the Plan and its purported comparators, they do not allege any facts regarding the nature, scope, or caliber of the recordkeeping services negotiated by each plan. *See* Appx2141 (¶ 101). They merely assert that the services provided to the comparator plans were of "the same level and quality" as, or "identical or similar" to, the services that WESCO negotiated for the Plan here. Appx2143, Appx2145 (SAC ¶¶ 105, 108).

Plaintiffs also allege that WESCO acted imprudently by failing to conduct a "request for proposal" or "RFP" process between 2009 and 2019 to gauge whether another recordkeeper could provide more competitive rates or to negotiate with Wells Fargo to reduce its fees. Appx2149 (SAC ¶ 122). As noted, however, WESCO concededly switched recordkeepers in July 2020, before Plaintiffs filed suit. Appx2147 (SAC ¶ 114). And before that switch, the Plan obtained multiple rate reductions from Wells Fargo (from 14 bps in 2015 to 6.5 bps in 2018). *See supra* pp. 11.

**B.    The District Court's Rulings**

The District Court issued three opinions dismissing each iteration of Plaintiffs' complaint.  Each time, the court recited in detail the applicable motion-to-dismiss standards from Third Circuit and Supreme Court precedent.  Appx0011-12; Appx0032-33; Appx0048-49.  Applying these standards, the Court concluded that Plaintiffs' latest pleading—filed after two opportunities to amend—still failed to state a legally sufficient claim for breach of the duty of prudence based on their allegations that WESCO allowed the Plan to incur imprudent and unreasonable fees or offered some investments in higher-cost share classes.  Appx0012-24.

Starting with the recordkeeping-fees claim, the District Court applied the approach prescribed by *Sweda v. University of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019), in light of the Supreme Court's recent guidance in *Hughes*, 142 S. Ct. 737, 742.  Appx0017-19.  Under those principles, a "price tag to price tag comparison" of Wells Fargo's services to the Plan and the services provided to other plans is insufficient to state a viable claim without adequate allegations about the nature, scope, and quality of services.  Appx0019-20.  In addition, the comparator plans identified by Plaintiffs often varied significantly from the Plan in their

number of participants and amount of assets.  Appx0021.  And the District Court noted other inconsistencies in Plaintiffs' methodology for calculating the fees supposedly paid by other plans.  Appx0022-23.  The Second Amended Complaint's allegations, taken as a whole, failed to raise a plausible inference that WESCO acted imprudently with respect to the Plan's recordkeeping fees.  Appx0023.

As for the share-class claim, the District Court explained that offering retail-class shares is not per se imprudent.  Appx0023-24.  Simply alleging that a fiduciary included retail-class shares of particular investment options does not allow a court to infer more than the "mere possibility of misconduct."  Appx0059 (citation omitted).  Nor does it suffice to fault fiduciaries for using "share classes with revenue sharing to pay any recordkeeping fees," at least when, as here, Plaintiffs failed to plausibly allege that the "recordkeeping fees were already too high."  Appx0041.

Last, the District Court observed that Plaintiffs' second count—for alleged failure to monitor co-fiduciaries—was derivative of their first count because it depends on Plaintiffs pleading an underlying fiduciary breach.  Appx0024.  Because Plaintiffs had not pleaded any underlying breach, this derivative claim warranted dismissal as well.  *Id.*

## SUMMARY OF ARGUMENT

I.    The Second Amended Complaint fails to state any plausible claim for breach of ERISA's fiduciary duty of prudence based on the Plan's allegedly excessive fees.

To start, Plaintiffs' own allegations and other judicially noticeable documents belie any assertion that Plan fiduciaries were "asleep at the wheel" with respect to recordkeeping fees. The Plan's recordkeeping fees steadily decreased over the relevant period, the Plan secured fee rebates for participants, and the Plan even switched recordkeepers in 2020, further reducing fees paid by participants.

What is more, Plaintiffs' attacks on the Plan's alleged recordkeeping fees rest on "price tag to price tag" comparisons with other plans, which courts of appeals have universally rejected post-*Hughes*. Such comparisons provide no basis to assess whether the fees were excessive without concrete factual allegations about the services that were provided in exchange for the fees at issue. Plaintiffs must plead facts showing that they are comparing apples to apples, and Plaintiffs here fail to do so. Moreover, Plaintiffs' comparisons are deficient for multiple other reasons as well, including because their hand-picked comparator plans

are not analogous in terms of participant counts and asset sizes and because their method for calculating fees is inconsistent across plans.

Plaintiffs' challenge to the Plan's offering of certain investments in "retail" share classes is simply a variation on their recordkeeping-fee claim and fails along with it. Plaintiffs acknowledge that the incrementally higher investment-management fees were used to pay the Plan's recordkeeping expenses through revenue sharing. Because there is nothing wrong with revenue sharing when the fees are not excessive, and because Plaintiffs fail to plausibly allege that the Plan's recordkeeping fees were excessive, this companion claim likewise fails as a matter of law.

II.    Plaintiffs' failure-to-monitor claim is derivative of their primary fiduciary-breach claim. Because the fiduciary-breach claim fails under Rule 12(b)(6), so, too, does the failure-to-monitor claim.

## STANDARD OF REVIEW

The Court reviews dismissals under Rule 12(b)(6) de novo. *E.g.*, *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 134 (3d Cir. 2022). It may affirm "on any ground supported by the record." *E.g.*, *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020) (citation omitted).

As in other cases, complaints alleging breaches of ERISA's duty of prudence are assessed under "the pleading standard discussed in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)." *Hughes*, 142 S. Ct. at 742. Under those cases, Rule 12(b)(6) requires dismissal when the complaint lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Court properly "disregard[s] rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *Sweda*, 923 F.3d at 325 (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a legally sufficient claim for relief. *Iqbal*, 556 U.S. at 678. Instead, a complaint must offer enough non-conclusory "factual content" to create "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557).

20

In the ERISA class-action context, a motion to dismiss is an "important mechanism for weeding out meritless claims." *Dudenhoeffer*, 573 U.S. at 425. This stage is important because "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous" and "elevates the possibility that 'a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* (*St. Vincent*), 712 F.3d 705, 719 (2d Cir. 2013) (citation and brackets omitted). To separate the "plausible sheep from the meritless goats," courts must give "careful, context-sensitive" consideration to whether the complaint satisfies *Twombly* and *Iqbal*'s pleading standard. *Dudenhoeffer*, 573 U.S. at 425-26. That in turn requires assessing whether the complaint plausibly alleges facts regarding fiduciary decisions that fall outside the "range of reasonable judgments a fiduciary may make." *Hughes*, 142 S. Ct. at 742. A "context-specific task" like this "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

21

## ARGUMENT

**I.    The District Court correctly held that Count I of the Second Amended Complaint fails to state a plausible claim based on purportedly excessive fees.**

Count I of the Second Amended Complaint asserts a breach of ERISA's fiduciary duty of prudence.  Appx2161 (SAC ¶ 164).  Under the statute, fiduciaries must "discharge [their] duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

When evaluating ERISA's duty of prudence, courts "focus[] on a fiduciary's conduct in arriving at an investment decision, not on its results."  *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996); *see also Sweda*, 923 F.3d at 329 ("[A] court assesses a fiduciary's performance by looking at process rather than results[.]").  The statute evaluates fiduciaries based on "the circumstances then prevailing" at the time of the challenged decisions.  29 U.S.C. § 1104(a)(1)(B).  Thus, courts do not evaluate fiduciaries' decisions "from the vantage point of hindsight."  *St. Vincent*, 712 F.3d at 716 (citation omitted).  "The fiduciary duty of care . . .

requires prudence, not prescience." *DeBruyne v. Equitable Life Assur. Soc. of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (citation omitted).

Rather than offer direct allegations of a flawed decision-making process, Plaintiffs instead ask the Court to infer that WESCO's process was flawed based on one of its alleged results—specifically, the supposedly "unreasonable level of fees the Plan paid for recordkeeping and administrative services." Appx2155 (SAC ¶ 142); *see also* Appx2150-51 (SAC ¶¶ 127-28).

But allegations about fees, without more, do not support an inference of imprudence. Since the duty of prudence turns on process, not results, Plaintiffs' allegations must establish "that a prudent fiduciary in like circumstances would have acted differently." *St. Vincent*, 712 F.3d at 720; *accord Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). And courts widely recognize that prudent fiduciaries need not prioritize cost-minimization above all else. *See, e.g.*, *Albert*, 47 F.4th at 579 ("This court has repeatedly emphasized that the cheapest investment option is not necessarily the one a prudent fiduciary would select."); *Smith*, 37 F.4th at 1169 ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible

fund (which might, of course, be plagued by other problems)." (citation omitted)); *Meiners*, 898 F.3d at 823-24 ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive in the market generally or that it is otherwise an imprudent choice." (emphasis omitted)).

The U.S. Department of Labor ("DOL") agrees.  DOL instructs that ERISA does not invariably mandate selecting "the least costly provider" of plan services.  U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan* 1, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf.   "Cost is only one factor to be considered in selecting a service provider."  *Id.* Indeed, because service-provider fees "are only one part of the bigger picture, including ... the extent and quality of services provided," prudent fiduciaries do not "consider fees in a vacuum."  U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 9 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

And the Supreme Court has stressed that "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs" at times. *Hughes*, 142 S. Ct. at 742. The *Hughes* decision therefore directed courts evaluating the plausibility of fiduciary-breach claims at the motion-to-dismiss stage to "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.*

These straightforward principles are fatal to Plaintiffs' claims. As the District Court recognized, Plaintiffs' allegations about the Plan's fees do not raise a plausible inference that WESCO's fiduciary process was flawed or that a prudent fiduciary would have necessarily acted differently. That reasoning finds support in decisions of this Court and courts around the country. *See, e.g.*, *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011) (affirming dismissal of ERISA fiduciary-breach claims because this Court was "unable to infer from what is alleged that the process is flawed" (citation omitted)); *St. Vincent*, 712 F.3d at 718 (explaining that fiduciary-breach claims survive dismissal only "if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed" (citation omitted)); *White v. Chevron*

*Corp.* (*White III*), 752 F. App'x 453, 455 (9th Cir. 2018) (affirming dismissal where "the allegations showed only that [the fiduciaries] could have . . . sought lower fees").

### A. Plaintiffs failed to adequately allege that the Plan's fees for recordkeeping and administrative services raise an inference of an imprudent fiduciary process.

#### 1. Plaintiffs' allegations show that WESCO actively monitored and succeeded in reducing the Plan's recordkeeping and administrative fees.

Plaintiffs' own allegations and the judicially noticeable documents included with WESCO's motion make clear that, since the start of the proposed class period in 2015, WESCO monitored and secured reductions in the Plan's recordkeeping and administrative expenses. Indeed, Plaintiffs allege that in 2020, before Plaintiffs filed suit, WESCO obtained a significant reduction in fees charged to participants by replacing Wells Fargo with a different recordkeeper, Fidelity. Appx2147-48 (SAC ¶ 114).

Despite acknowledging WESCO's replacement of Wells Fargo in 2020, Plaintiffs allege that WESCO "acted imprudently by failing to conduct an RFP process or otherwise obtain competitive quotes from other service providers from at least 2009 through 2019." Appx2149 (SAC ¶ 122); *see also* Pls.' Br. 38. But even if true, this allegation does not

justify an inference of imprudence. As the Seventh Circuit and other courts have explained, "a failure to regularly solicit quotes or competitive bids from service providers" does not give rise to an imprudence claim. *Albert*, 47 F.4th at 579; *see also, e.g.*, *Matney v. Barrick Gold of N. Am., Inc.*, No. 20-cv-275, 2022 WL 1186532, at *12 (D. Utah Apr. 21, 2022) ("[N]othing in ERISA requires a fiduciary to obtain competitive bids at any regular interval."), *appeal filed*, No. 22-4045 (10th Cir.); *White v. Chevron Corp.* (*White I*), No. 16-cv-793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) ("[T]he allegation that the Plan fiduciaries were required to solicit competitive bids on a regular basis has no legal foundation.").

Besides, Plaintiffs' allegations on this subject do not even pass their own test for showing imprudence. The proposed class period here begins on March 26, 2015—six years before Plaintiff filed the lawsuit. *See* Appx0064; Appx2156 (SAC ¶ 144). Any events before March 2015 are beyond ERISA's six-year statute of repose and irrelevant. *See, e.g.*, *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (noting that ERISA only provides relief for breaches that occur within six years of the lawsuit). The relevant period for Plaintiffs' RFP allegations is instead March 2015

through 2019, which is a period of less than five years. Even on Plaintiffs' account, a reasonable interval for competitive bidding is "every three to five years." Appx2136 (SAC ¶ 90). Plaintiffs have not alleged that WESCO acted outside that standard within the proposed class period.[3]

In addition, WESCO secured reductions in the Plan's recordkeeping and administrative fees before switching to Fidelity. Between January 2015 and October 2018, Plan recordkeeping fees dropped multiple times—from 14 bps to 11 bps to 9.5 bps to 6 bps. Appx2479; Appx2463-64; Appx2469-70; Appx2475-76. Separately, in 2018 and 2019, WESCO procured a credit for Plan participants as a rebate because a portion of the fees collected through revenue sharing "were not needed to pay for

---

[3] Plaintiffs also attempt to use the Plan's shift to Fidelity as record-keeper as a cudgel against the fiduciaries—suggesting that the change amounts to some sort of concession that the Plan's prior recordkeeping arrangement was imprudent. That is not the law. *See, e.g.*, *Smith*, 37 F.4th at 1169 (rejecting similar argument as to a plan's removal of an investment option, which "simply show[ed] that [the fiduciary] ful-filled its continuing duty" and that the process was working). If it were, fiduciaries would be disincentivized from ever trying to improve the administration of a plan for fear that any potential improvements or changes would be painted as evidence of alleged imprudence. *See* Fed. R. Evid. 407 (Subsequent Remedial Measures); *see also, e.g.*, *White I*, 2016 WL 4502808, at *17 (finding that removal of a fund "cre-ate[d] a plausible inference that the Plan fiduciaries were attentively monitoring the fund," and rejecting inference of imprudence).

administrative and recordkeeping costs" during those years. *See* Appx2481; Appx2483; *cf.* Appx0835 (FAC ¶ 100 n.13).

All these facts belie Plaintiffs' portrayal of WESCO as "asleep at the wheel" in failing to monitor and negotiate the Plan's recordkeeping and administrative fees. *See* Pls.' Br. 32 (citation omitted). On the contrary, WESCO consistently worked to reduce those fees throughout the proposed class period. Those facts reflect a prudent process, not an imprudent one. *See, e.g.*, *Matney*, 2022 WL 1186532, at *12 (dismissing similar excessive-fees claims because, among other reasons, "Defendants did manage, and reduce, [the recordkeeper's] fees over the years").

### 2. Courts have widely rejected Plaintiffs' threadbare and conclusory allegations.

Despite the above facts, Plaintiffs try to raise an inference of a flawed process by comparing the fees supposedly paid by the Plan to those supposedly paid by a hand-picked selection of sixteen other plans. But consistent with many recent appellate decisions, the District Court rightly rejected these circumstantial allegations as insufficient.

This case law recognizes that to raise plausible inferences based on comparisons, a plaintiff must allege facts showing that the comparisons are apt. *See, e.g.*, *Matousek*, 51 F.4th at 278 ("The key to nudging an

inference of imprudence from possible to plausible is providing 'a sound basis for comparison—a meaningful benchmark'—not just alleging that 'costs are too high, or returns are too low.'" (citation omitted)).  A plaintiff cannot show, as they must, that "fees were excessive relative to the services rendered" by drawing comparisons to plans that "offer fewer services and tools to plan participants." *Smith*, 37 F.4th at 1169 (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (per curiam)).  "Even if the fees [paid by a defendant's plan] look high, [courts] cannot infer imprudence unless similarly sized plans spend less on *the same services*." *Matousek*, 51 F.4th at 279 (emphasis added).  A legally sufficient complaint therefore must at least include "allegations as to the quality or type of recordkeeping services the comparator plans provided." *Albert*, 47 F.4th at 579.  A higher price tag, standing alone, does not show that the "fees were high in relation to the services that the plan provided" or that they "could not be justified by the plan's strategic goals relative to their selected comparators." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th Cir. 2022).

In each of the foregoing rulings—all issued since the Supreme Court's decision in *Hughes*—the courts affirmed the dismissal of excessive-fees claims that are indistinguishable from Plaintiffs' claims here. *See Matousek*, 51 F.4th at 278-80; *Albert*, 47 F.4th at 579-80; *Forman*, 40 F.4th at 449; *Smith*, 37 F.4th at 1169. And district courts across the country have likewise dismissed such claims for similar reasons. *See, e.g.*, *Singh v. Deloitte LLP*, No. 21-cv-8458, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) ("[P]laintiffs must allege more than just that the 401(k) [p]lan's recordkeeping fees were higher than those of other plans . . . . [P]laintiffs must plausibly allege that the administrative fees were excessive *relative to the services rendered*." (emphasis added)); *Krutchen v. Ricoh USA, Inc.*, No. 22-cv-678, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022) ("Fiduciaries may select diverse services from bundled offerings or elect additional [a la] carte services, prioritizing various options differently depending on their plans' unique needs and reasonably choosing to pay more for higher quality services."); *Perkins v. United Surgical Partners Int'l Inc.*, No. 21-cv-973, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022) ("[A] plaintiff must 'plead that the administrative fees are excessive in relation to the *specific services* the recordkeeper provided to

the *specific plan* at issue." (citation omitted)).[4]    The District Court
properly followed these same principles in rejecting Plaintiffs' claims
here.  *See* Appx0020.

Like the complaints dismissed in these other cases, the Second
Amended Complaint says very little about the recordkeeping services
provided to the WESCO Plan or Plaintiffs' proposed comparators.  For
the WESCO Plan, Plaintiffs allege that the available services included
"Internet access to their accounts through the Plan website maintained
by Wells Fargo; transaction processing (buying and selling Plan invest-
ments); quarterly participant statements; participant communications,
including Plan investment disclosures and periodic participant newslet-
ters; retirement education services, including various tools such as re-
tirement income calculators available on the Plan website; and a tele-
phone support to answer questions or give assistance to Plan partici-
pants."  Appx2137 (SAC ¶ 94).  "Wells Fargo also offered a brokerage
window that allowed Plan participants to invest in securities that were

---

[4]    *See also, e.g.*, *Gonzalez v. Northwell Health*, No. 20-cv-3256, 2022 WL
4639673, at *10 (E.D.N.Y. Sept. 30, 2022) ("A plaintiff must plead ad-
ministrative fees that are excessive *in relation to the specific services*
the recordkeeper provided *to the specific plan at issue*." (emphases
added (citation omitted)); *Riley v. Olin Corp.*, No. 21-cv-1328, 2022 WL
2208953, at *4 (E.D. Mo. June 21, 2022) (same).

not Plan investment options." *Id.* For the comparators, Plaintiffs merely allege that the recordkeepers "provided the same services" or "identical or similar services of the same quality." Appx2145 (SAC ¶¶ 105, 108). But these are just recitations of what Plaintiffs must establish to prevail. *See, e.g.*, *Matousek*, 51 F.4th at 279 ("[T]he way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." (citing *Albert*, 47 F.4th at 579-80, and *Sweda*, 923 F.3d at 330)). In other words, they are textbook examples of the sorts of conclusory statements that a court must disregard in evaluating a motion to dismiss. *See, e.g.*, *Iqbal*, 556 U.S. at 680-81 (explaining that "conclusory" allegations that formulaically recite a claim's elements "are not entitled to the assumption of truth"); *Sweda*, 923 F.3d at 325 ("[W]e disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." (citation omitted)).

For price comparisons to raise an inference of an imprudent fiduciary process, there must also be nonconclusory, fact-based allegations that the cheaper services were as good as or better than the more expensive ones. It is not enough to allege that the services fit within the same gen-

eral categories.  Consider, for instance, the category of "telephone support."  Appx2137 (SAC ¶ 94).  Although it may cost less to hire a team of two call-center representatives than a team of eight—and even less to hire a single person who picks up only when automated systems fail—that does not mean spending more is imprudent, let alone a sign of a flawed decision-making process.  Prudent fiduciaries could easily disagree about whether a higher cost is worth reducing the anticipated wait time when participants call with questions.  The same is true of other recordkeeping services, like "retirement education services": it might cost more to make available regular live educational seminars versus preprogrammed online content.  *See, e.g.*, *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 299 n.55 (S.D.N.Y. 2018) (contrasting one recordkeeper's "'high-touch' service model" that included "a minimum of 150 days per year of on-site education (e.g., one-on-one counseling and/or group meetings)," to another recordkeeper's package of services that did not include "on-site education"), *aff'd in relevant part*, 9 F.4th 95 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022).  Other examples abound.  Simply put, without knowing what services were provided for the fees at issue, and how those

services were provided, it is impossible to suggest that the amount of fees spent was unreasonable or excessive.

Nor is it enough to merely allege that certain categories of services were offered by the same recordkeeper, as the same recordkeeper may and often does offer different levels of service at different prices to different plans. *See, e.g.*, DOL, *Understanding Retirement Plan Fees and Expenses*, *supra*, at 6 (advising fiduciaries to assess "the possible extras or customized services" that they want from their service provider); *Singh*, 2023 WL 186679, at *5 ("The plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range."). There is no way to infer that fiduciaries were acting outside "the range of reasonable judgments" if the allegations do not explain what the spending purchased. *See Hughes*, 142 S. Ct. at 742.

In short, the Second Amended Complaint offers "bare allegations regarding the difference in recordkeeping fees and conclusory allegations regarding corresponding services." Appx0019. The District Court followed settled law in holding that because Plaintiffs' allegations "depend on a price tag to price tag comparison, the Second Amended Complaint

should contain sufficient details regarding services." Appx0020.  Because

Plaintiffs failed to assert those sorts of factual allegations even after

three attempts to plead their claims, dismissal was proper on this basis.

### 3.    Flaws in Plaintiffs' comparisons further undermine their attempt to state a claim.

To make matters worse, many of Plaintiffs' fee comparisons are

flawed on their face, are inconsistent with their own source materials,

and/or were derived using a different methodology to estimate fees than

the methodology Plaintiffs claim to have used for the WESCO Plan.  The

District Court identified some of these problems, which provide addi-

tional reasons not to depart in this case from the baseline principles dis-

cussed above and applied in other cases.  *See* Appx0021-22.

To support a plausible claim of fiduciary breach based on a claim of

excessive fees, a plaintiff must point to "meaningful" benchmarks—*i.e.*,

"like-for-like comparison[s]."  *Matousek*, 51 F.4th at 279-80; *Albert*, 47

F.4th at 582.  As to recordkeeping fees, this is true not only when it comes

to the levels, types, and caliber of services provided in exchange for the

fees (as discussed above), but also when it comes to the size of the plans

being used for comparison and the methodology by which their fees are

calculated. *See, e.g., Matousek*, 51 F.4th at 279 ("[W]e cannot infer imprudence unless similarly sized plans spend less on the same services."). Plaintiffs' recordkeeping-fee comparisons are demonstrably not "like-for-like" in several significant ways.

For example, many of Plaintiffs' proposed comparators are not comparable to the WESCO Plan in terms of the number of participants and level of plan assets. Plaintiffs admit that plan size can affect the cost of recordkeeping and administrative services. Appx2111 (SAC ¶ 10 (asserting that fiduciaries must price services "at a reasonable level *for the size of the Plan*" (emphasis added)). Using the Plan's 2018 statistics, Plaintiffs allege that the Plan had 8,232 participants and $670 million in assets. Appx2140 (SAC ¶ 98). The alleged comparators, in contrast, ranged in 2018 from 4,950 participants to 13,502 participants and from $218 million in assets to over $2 billion. Appx2142-44 (SAC ¶¶ 102, 106). In other words, one plan had only 60% of the number of participants as the Plan, and one plan had 64% more participants than the plan. Seven plans had less than half of the Plan's assets (*i.e.*, less than $335 million), and one plan had over double the Plan's assets (*i.e.*, over $1.340 billion), with two other plans not far behind. *See id.* The comparators are all over the map

in terms of participants and assets.  In fact, if one limited Plaintiffs' comparators to plans that have both a number of participants and an amount of assets in the range of 75% to 125% of the Plan's 2018 participants and assets—*i.e.*, between 6,174 and 10,290 participants, and $503 million and $838 million in assets—only three would remain: the Kemper Corporation 401(k) Retirement Plan, Ralph Lauren Corporation 401(k) Plan, and Edward-Elmhurst Healthcare Retirement Savings Plan.  *See id.*

Particularly when there are hundreds of thousands of 401(k) plans, and surely thousands that have participants and assets close to the Plans, Plaintiffs' smattering of cherry-picked plans cannot serve as a meaningful fee benchmark or create an inference of imprudence.  *See, e.g., Albert v. Oshkosh Corp.*, No. 20-cv-901, 2021 WL 3932029, at \*5 (E.D. Wis. Sept. 2, 2021) ("[T]he mere existence of purportedly lower fees paid by other plans says nothing about the reasonableness of the Plan's fee[.]"), *aff'd*, 47 F.4th 570, *reh'g denied*, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022).  By mathematical necessity, half of all retirement plans always pay above-median-average amounts for recordkeeping, even if all plans are prudently run.  So it cannot be, as Plaintiffs imply, that merely paying more than average is grounds for inferring

that a prudent fiduciary "would have acted differently." *St. Vincent*, 712 F.3d at 720. And less still can the purported fees from just a handful of cherry-picked comparators plausibly give rise to such an inference.[5]

This problem is amplified even more by the fact that Plaintiffs' allegations focus on fees for a single year (2018) within a putative class period that reaches back nearly eight years (to March 2015). The Second Amended Complaint does not include any allegations about how the WESCO Plan's recordkeeping fees allegedly compared to the fees paid by their comparator plans at any other point. And it certainly does not include any allegations about how the fees for their comparator plans changed over time—*i.e.*, whether they steadily decreased (like the

---

[5] The Second Amended Complaint also cites a report from the consulting group NEPC to argue that the Plan's alleged fees were excessive. Appx2147 (SAC ¶ 113). But as the District Court and several other courts have explained, the NEPC report's generality prevents its figures from serving as a meaningful benchmark. *See, e.g.*, *Matousek*, 51 F.4th at 280; *Perkins*, 2022 WL 824839, at *6; *Krutchen*, 2022 WL 16950264, at *3; Appx0039. Indeed, the NEPC report itself acknowledges that "[h]igher (or lower) record keeping fees are a function of plan size and complexity, and the *package of services* the plan sponsor has contracted for" and that "operational complexity and *service levels drive meaningful differentiation in price*." NEPC, *2019 Defined Contribution Progress Report* 10, https://cdn2.hubspot.net/hubfs/2529352/2019%20DC%20Plan%20and%20Fee%20Survey%20(progress%20report)/2019%20NEPC%20DC%20Plan%20Progress%20Report.pdf (last visited Jan. 23, 2023) (emphasis added).

WESCO Plan's fees), remained stagnant, or potentially even increased from one year to another. Those "context-specific" details, *Hughes*, 142 S. Ct. at 742, are critically important to assessing the plausibility of an allegedly imprudent fiduciary process based on a comparison of fees.

Another problem is that Plaintiffs' own pleading and the publicly available documents on which Plaintiffs purportedly relied show that the numbers in Plaintiffs' charts are not "apples to apples" comparisons. Appx0022. For starters, Plaintiffs admit that they calculate fees differently for WESCO than for other plans. On the WESCO Plan, Plaintiffs claim to have determined the amount of direct fees by multiplying the Plan's total assets (minus loans) by the "Additional Asset Based Fee" rates reflected in the Wells Fargo Agreement and then dividing by the number of participants. Appx2138-39 (SAC ¶ 97 n.16). Plaintiffs then add this "direct fee" number to "indirect fees," which they allegedly calculated by multiplying year-end assets in each mutual fund by the percentage of "Asset Based Fees Paid by Fund." Appx2139-41 (SAC ¶¶ 98-99 & nn.19-20). Plaintiffs cannot duplicate this process for every comparator—and acknowledge as much—because no revenue-sharing rates were disclosed in the financial statements attached to the Form 5500s on

which they claim to rely. *See, e.g.*, Appx2530-67 (Carlisle 2018 Form 5500); Appx2569-605 (HealthFirst 2018 Form 5500); Appx2607-42 (Rackspace 2018 Form 5500); Appx2644-82 (Boston Consulting Group 2018 Form 5500). So for these other plans, Plaintiffs use the direct fee amounts listed in the Form 5500 filings, and then claim to be adding indirect fee amounts "using publicly available revenue sharing rates" for these other plans. Appx2142-43 (SAC ¶ 103). They do not explain where or how those rates for other plans are "publicly available." *See, e.g.*, *Cunningham v. USI Ins. Servs., Inc.*, No. 21-cv-1819, 2022 WL 889164, at *5 (S.D.N.Y. Mar. 25, 2022) (faulting ERISA plaintiffs for failing to explain the source of indirect fee calculations and dismissing recordkeeping-fee claim on this and other bases); *Wehner v. Genentech*, No. 20-cv-6894, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021) (same).

Worse still, Plaintiffs do not even attempt to include indirect fees at all for some of the comparators. Their amount for the Edward-Elmhurst plan, for instance, is just the "direct compensation" paid to the recordkeeper as set forth on the plan's Form 5500, even though the same Form 5500 shows the recordkeeper also received indirect compensation. *Compare* Appx2144 (SAC ¶ 106), *with* Appx2748. That is also true for

their amount for the Red Lobster 401(k) Plan, whose Form 5500 further states that there was no rebate of excessive revenue-sharing amounts that year. *Compare* Appx2142 (SAC ¶ 102), *with* Appx2807, Appx2835. The District Court correctly observed that Plaintiffs are not entitled to an inference of imprudence from these sorts of apples-and-oranges comparisons. *See* Appx0022; Appx0056-57; *cf., e.g., Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) ("Comparing apples and oranges is not a way to show that one is better or worse than the other.").[6]

---

[6] On a side note, Plaintiffs' method for adding the WESCO Plan's "direct" and "indirect" fees is incorrect and wildly overstates Wells Fargo's fees. Wells Fargo did not receive any "direct" fees from the Plan, as confirmed by the absence of any such fees in the participant disclosures that all participants (including Plaintiffs) received. *See* Appx2200-30. Rather, for the Plan-wide services relevant here, Wells Fargo received only an indirect annual fee calculated as a percentage of the Plan's total assets, in the amounts shown in the "Additional Asset Based Fees" or "Asset Based Wrap Fees" columns of the Wells Fargo agreements. *See* Appx2463-79. But as the "Asset Based Fees Paid By Fund" columns show, only certain investment options generated asset-based fees, and they did so at different rates. *See id.* As a result, the fees generated by each option were pooled together, and the Plan paid Wells Fargo's total Plan-wide asset-based fee from that pool, rebating any excess amounts to participants. *See* Appx2481-83. By adding the ultimate actual charge to the constituent revenue-sharing amounts that generated the pool of funds from which that ultimate charge was paid, Plaintiffs essentially double-count the compensation Wells Fargo received for its services, and then some.

In short, Plaintiffs' "price tag to price tag" comparisons of record-keeping providers—without any non-conclusory factual allegations about the services that the WESCO Plan or the comparator plans negotiated in exchange for the different alleged fees—fail to show that the Plan's recordkeeping fees were outside the "range of reasonable judgments" that fiduciaries make, *Hughes*, 142 S. Ct. at 737, much less that the Plan's fiduciary process was imprudent. The additional shortcomings with Plaintiffs' fee-related comparisons drive that point home even more so.

### B. Plaintiffs failed to adequately allege that the Plan's retail-class investment options raise an inference of an imprudent fiduciary process.

The other strand of Plaintiffs' imprudence claim focuses on the inclusion of the American Funds suite of ten target-date funds and nine other investment options in a "retail" share class rather than their "institutional" share class, which charged lower expense ratios. Appx2153-54 (SAC ¶ 137). On appeal, Plaintiffs make this share-class argument their lead argument for reversal—in an apparent effort to compare their claim to claims that survived dismissal in other cases. *See* Pls.' Br. 29-32. But Plaintiffs' own allegations defeat their reliance on these cases. More specifically, Plaintiffs' version of this "share-class" claim explicitly

ties it to their primary contention that Wells Fargo's compensation for recordkeeping services was excessive. Because that primary contention fails for the reasons just discussed, their interdependent share-class allegations fail to state a claim as well.

As the Second Amended Complaint explains, "[d]efined contribution plans often select mutual fund share classes that include revenue sharing to pay for some or all of the plan administrative expenses." Appx2152 (SAC ¶ 132). And here, Plaintiffs admit that the nineteen retail-class investment options that they challenge "paid revenue sharing to Wells Fargo." *Id.* (SAC ¶ 133). Plaintiffs specifically allege, in fact, that "[t]he difference in the cost of the share classes" as between the Plan's retail-class options and Plaintiffs' preferred institutional-class versions "was revenue sharing paid to Wells Fargo." Appx2153 (SAC ¶ 137 n.31). In other words, by Plaintiffs' own account, the Plan's fiduciaries put the incremental difference in fees for those investments—ranging from 0.05% to 0.22%, depending on the fund (Appx2152-53 (SAC ¶¶ 132-33, 137 n.31)—toward revenue sharing to pay for recordkeeping.

Plaintiffs' admission that the difference in expense ratios was attributable to revenue sharing means that their share-class claim rests on

a very specific and focused theory: that WESCO "acted imprudently by not removing the higher cost share classes . . . after realizing that Wells Fargo was being paid an unreasonable amount for its recordkeeping and administrative services." Appx2155 (SAC ¶ 141); *see also id* (SAC ¶ 140) (confirming that Plaintiffs' share-class theory rests on their contention that "revenue sharing was not required to pay Wells Fargo for its record-keeping and administrative services," yet WESCO "continu[ed] to offer mutual fund share classes that paid revenue sharing").

But for all the reasons explained, Plaintiffs have failed to ade-quately allege a claim that Wells Fargo received unreasonably high recordkeeping and administrative fees. *See supra* Part I.A.  In turn, Plaintiffs' interdependent share-class claim fails as well.  Because the retail-class options concededly funded the recordkeeping and administra-tive services, Plaintiffs cannot cast doubt on WESCO's fiduciary decision-making process regarding the Plan's share-class offerings without plau-sible allegations that the resulting recordkeeping and administrative funding was excessive, and they fail to accomplish that antecedent step.

The interrelatedness of these claims—and the legal insufficiency of the underlying excessive-recordkeeping-fees claim—distinguishes this

case from those on which Plaintiffs rely.  For example, in *Forman*, there was no concession that the defendants offered retail-class options to fund revenue sharing: "Revenue sharing [was] 'one plausible inference, but it [was] not the only one.'" *Forman*, 40 F.4th at 453 (citation omitted).  And, tellingly, those defendants had not even "offered this alternative explanation" for their inclusion of the retail-class options.  *Id.* at 452.  Likewise, in the nonprecedential ruling in *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022), the revenue-sharing explanation for the retail-class options was "plausible" but inconsistent with plaintiffs' own, also "plausible" explanation.  And the nonprecedential ruling in *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022), is similar: revenue sharing "show[ed] only what could occur in theory—not what occurred in fact." Here, in contrast, there is no conflict between a revenue-sharing explanation and Plaintiffs' explanation.  It is not merely one possible "theory" against a competing theory that is alleged.  Instead, Plaintiffs themselves plead revenue sharing as *the reason* for the inclusion of these retail-class options, and they allege that revenue-sharing accounts for the entirety of

the cost differential between the different share classes. Appx2152-53 (SAC ¶¶ 132-33, 137 n.31).

In *Sacerdote v. New York University*, 9 F.4th 95, 111 (2d Cir. 2021), on the other hand, the propriety of the overall level of the plan's record-keeping and administrative fees was an open question. According to the majority, it was unclear whether the "revenue sharing could [have been] achieved with fewer retail shares." *Id.* Here, however, without plausible allegations that the revenue sharing resulted in an unreasonable level of compensation to Wells Fargo, the claim would require a categorical rule against including retail-class investment options in an ERISA retirement plan. That sort of rule would impermissibly limit fiduciaries' legitimate range of discretionary choices especially when, as here, the Plan obtained rebates of revenue-sharing payments during the proposed class period. *See* Appx2481-83; *see also* Appx2152 (SAC ¶ 132 (alleging that prudent fiduciaries guard against "high fees" by "requiring the service provider to rebate the excess" amounts of "revenue sharing").

In fact, in other cases, plaintiffs have alleged that retail-class op-tions are *better* than institutional-class options because they permit rev-enue sharing and these sorts of rebates, which, according to those cases,

47

sometimes lead to lower net fees for participants at the end of the day. *See, e.g.*, *Albert*, 47 F.4th at 581 (describing imprudence claim premised on a theory that a plan "should have offered higher-cost share classes of certain mutual funds because the 'net expense' of those funds would be lower in light of revenue sharing"). That is not to say that one approach is necessarily better or more prudent than the other, at least for a plan that uses revenue sharing to cover recordkeeping fees, as the WESCO Plan did here. The point is that reasonable fiduciaries can make different judgments. Some fiduciaries might deem it preferable to offer some investment options with slightly higher investment expenses to offset recordkeeping fees that would otherwise be charged separately (followed by rebates when those expenses exceed what is needed to pay for recordkeeping services). Other fiduciaries might instead choose to offer only investments with the lowest up-front fees and assess some type of separate charge for recordkeeping services (and no possibility of later rebates). *See id.* ("While a prudent fiduciary might consider such a metric, no court has said that ERISA requires a fiduciary to choose investment options on this basis."). The law does not impose a categorical prohibition on either approach, including one that offers retail-class options.

Indeed, as the District Court recognized, "ample authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach." *White v. Chevron Corp.* (*White II*), No. 16-cv-793, 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017), *aff'd,* 752 F. App'x 453 (9th Cir. 2018); *accord Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1199 (D. Colo. 2021); *see also, e.g.*, *Loomis*, 658 F.3d at 671 (rejecting argument "that the number of 'retail' funds must be zero"); *Brown v. Daikin Am., Inc.*, No. 18-cv-11091, 2021 WL 1758898, at *7 (S.D.N.Y. May 4, 2021) ("[T]he mere fact that Daikin selected retail share classes for certain investment options in the Plan does not establish a breach of fiduciary duty under ERISA."); *cf. Sacerdote*, 9 F.4th at 125 (Menashi, J., dissenting in part) (observing that the majority was not embracing a categorical rule against retail-class investment options, but a "numerical" argument about the overall level of revenue sharing).  A categorical rule allowing claims to proceed based solely on the presence of retail-class shares—particularly in the face of Plaintiffs' express and admitted revenue-sharing explanation here— would violate the Supreme Court's admonition that "the appropriate inquiry will necessarily be context specific" and that fiduciaries can draw

on experience and expertise to make a "range of reasonable judgments." *Hughes*, 142 S. Ct. at 742; *cf. Sweda*, 923 F.3d at 336 (agreeing that "paying for recordkeeping with asset-based revenue sharing is not a *per se* violation of ERISA" (cleaned up)).

In short, without a legally sufficient claim that the revenue sharing enabled by the retail-class options led to unreasonable fees for record-keeping overall, Plaintiffs' share-class challenge likewise goes nowhere.

### C. Plaintiffs' assorted objections to the District Court's ruling lack merit and provide no basis for reversal.

Plaintiffs venture three further arguments to claim that the District Court applied incorrect pleading standards. None of these arguments succeeds.

First, Plaintiffs accuse the District Court of applying a heightened "probability" standard instead of the "plausibility" standard of *Twombly* and *Iqbal*. Pls.' Br. 13-14, 20. This accusation is meritless. It rests entirely on a passing reference to another Western District of Pennsylvania decision in the middle of a lengthy, multipage recitation of the applicable standards. Appx0017 ("That said, allegations must cross 'the threshold from possible to probable.'" (quoting *Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 20-cv-1493, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021));

*see also* Appx0016-19.  The District Court did not return to the concept of "probability" at any other point in its opinion.  On the contrary, it consistently used the "plausibility" standard that Plaintiffs admit is correct.  *See, e.g.*, Appx0019 ("[A] side by side list comparison does not sufficiently place the Defendants on notice or slide Plaintiffs['] claim from possible to plausible." (citation and quotation marks omitted)); Appx0020 ("Such allegations are too generalized and speculative to move into the realm of the plausible."); Appx0023 ("Plaintiffs' Second Amended Complaint only infers a possibility but not a plausibility that Defendants acted imprudently."); Appx0042 ("Plaintiffs must aver some non-conclusory factual basis that reaches beyond the threshold of a plausible claim rather than a possible claim." (citation omitted)); *cf. Twombly*, 550 U.S. at 557 (requiring complaints to cross "the line between possibility and plausibility of 'entitle[ment] to relief.'" (citation omitted)).  Plaintiffs' assertion that the District Court's passing quotation about probability "infected its entire analysis" is refuted by any fair reading of the District Court's opinions.  *See* Pls.' Br. 13.

Second, Plaintiffs grasp at straws in seeking to derive support from *Hughes*. *E.g.*, *id.* at 12-13, 15, 20. As the Seventh Circuit recently explained in rejecting a similar misreading of *Hughes*, "*Hughes* merely rejected [the Seventh Circuit's] assumption that the availability of a mix of high-cost and low-cost investment options in a plan insulated fiduciaries from liability." *Albert*, 47 F.4th at 580 (citing *Hughes*, 142 S. Ct. at 742). Recent rulings from the Sixth, Seventh, and Eighth Circuit all confirm that *Hughes* does not relieve plaintiffs who assert recordkeeping-fee claims from adequately pleading "that the [recordkeeping] fees were excessive relative to the services rendered." *Id.* (quoting *Smith*, 37 F.4th at 1169); *see also Matousek*, 51 F.4th at 279-80. If anything, *Hughes* reinforces the insufficiency of Plaintiffs' cost-above-all-else allegations given the need for courts to "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 142 S. Ct. at 742.

Third, Plaintiffs likewise misread this Court's ruling in *Sweda* when they argue that it supports a lower pleading standard. In *Sweda*, participants in the University of Pennsylvania's retirement plan asserted that fiduciaries breached their duties based on a wide range of allegations

challenging not only the plan's administrative fees, but also many different facets of the plan's investment offerings and investment-related fees. 923 F.3d at 324-25, 330-31. Specifically, in their 117-page, 237-paragraph complaint,[7] the *Sweda* plaintiffs alleged that the plan: (1) included too many investment options (as many as 118) that "were duplicative . . . and confus[ed] participants"; (2) retained several investments with "layers of unnecessary fees"; (3) did not remove "underperform[ing]" investments, which were alleged to make up 60% of the plan's lineup; (4) offered "higher cost retail class shares" of many investment offerings; and (5) "paid excessive administrative fees," including by retaining multiple recordkeepers instead of "consolidat[ing] services with a single provider." *Id.* at 330-31. After "employ[ing] a holistic approach" to those allegations and viewing them collectively, the court found they added up to sufficient "circumstantial evidence from which the [court] could reasonably infer that a breach had occurred" in the fiduciary process. *Id.* at 332.

The allegations here are much narrower in scope and set this case far apart from the claims at issue in *Sweda*. First, Plaintiffs' challenge

---

[7] Amended Complaint, *Sweda v. Univ. of Pa.*, No. 16-4329, (E.D. Pa. Nov. 21, 2016), ECF No. 27.

to the Plan's investment offerings is limited solely to their claim that WESCO should have always selected the lowest-cost share class. And as noted above, even those limited allegations are simply a gloss on the recordkeeping-fee claim because, by their own account, Plaintiffs allege that the extra "retail" fees were put toward revenue sharing to pay for recordkeeping expenses. In *Sweda*, there was no similar suggestion, much less express admission, that the additional fees for higher-cost shares were used to offset recordkeeping fees through revenue sharing.

Beyond that, unlike the complaint in *Sweda*, there are no allegations here that the Plan offered too many investments (including multiple options in the same asset class and investment style), underperforming investments, or investments with unnecessary "layers" of fees. 923 F.3d at 330-31. Nor is there any allegation here, unlike in *Sweda*, that the numerous duplicative investments decreased the value of actively managed funds and confused participants. *Id.* at 331. In addition, the *Sweda* plaintiffs asserted that the plan's use of multiple recordkeepers, instead of a single provider, squandered the plan's negotiating leverage. *Id.* at 324-25, 330-31. Here, there is no dispute that the Plan used a sin-

gle recordkeeper at all relevant times, and—as discussed above—Plaintiffs' own allegations show that the Plan negotiated multiple fee reductions over time and even replaced the Plan's recordkeeper in the midst of the relevant period, which further reduced fees.

This case is far afield from *Sweda*. The District Court faithfully adhered to *Sweda* throughout its opinions, and Plaintiffs' suggestion otherwise is unsupported. *See* Appx0017-18, Appx0025; Appx0035-37, Appx0042; Appx0054-56, Appx0059.

## II. The District Court correctly held that Count II of the Second Amended Complaint fails to state a plausible claim based on monitoring other fiduciaries because it is derivative of Count I.

Plaintiffs allege in Count II that WESCO breached its fiduciary duties by failing to monitor the individuals responsible for overseeing the Plan's fees for retirement plan services and by failing to monitor the process by which the Plan investigated the availability of lower-cost share classes of certain mutual funds. Appx2161-63 (SAC ¶¶ 168-74). As the District Court recognized, this claim is derivative of Plaintiffs' primary claim in Count I and fails along with it. Appx0059-60; *see also, e.g.*, *In re Allergan ERISA Litig.*, 975 F.3d 348, 354 n.11 (3d Cir. 2020) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor . . . absent an

55

underlying breach of the duties imposed under ERISA[.]" (quoting *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016))); *Spear v. Fenkell*, No. 13-02391, 2015 WL 3643571, at *22 (E.D. Pa. June 12, 2015) ("To the extent that the underlying fiduciary violation claims have been dismissed, the derivative failure to monitor claim will be dismissed[.]").   Plaintiffs do not dispute that conclusion on appeal, but merely reassert the legal sufficiency of their underlying allegations.   Pls.' Br. 49.   Because the Court should affirm the dismissal of Count I, it should also affirm the dismissal of the derivative monitoring claim in Count II.   *See, e.g.*, *Edgar v. Avaya, Inc.*, 503 F.3d 340, 349 n.15 (3d Cir. 2007) ("Because we affirm the District Court's dismissal of Edgar's duty of prudence claim, there is no basis for us to disturb the District Court's dismissal of [the duty-to-monitor-fiduciaries] claims."), *abrogated on other grounds by Dudenhoeffer*, 573 U.S. 409.

## CONCLUSION

For all these reasons, the judgment of the District Court should be affirmed.

Dated:  January 23, 2023                    Respectfully submitted,

                                            s/ Matthew J. Sharbaugh

Deborah S. Davidson                         Matthew J. Sharbaugh
MORGAN, LEWIS & BOCKIUS LLP                 Michael E. Kenneally
110 North Wacker Drive                      MORGAN, LEWIS & BOCKIUS LLP
Chicago, IL  60606                          1111 Pennsylvania Avenue, NW
(312) 324-1000                              Washington, DC  20004
                                            (202) 739-3000

Stephanie R. Reiss
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre, 32nd Floor
Pittsburgh, PA  15219
(412) 560-3300

*Counsel for Defendants-Appellees*

## COMBINED CERTIFICATES OF COMPLIANCE

In accordance with Local Appellate Rules 28.3(d) and 46.1(e), I certify that all attorneys whose names appear on this brief are members in good standing of the bar of this Court or have filed an application for admission.

In accordance with Local Appellate Rule 31.1(c), I certify that the texts of the electronic brief and paper copies are identical and that Microsoft Defender Offline scanned the file and did not detect a virus.

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,116 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1), according to the word count of Microsoft Word 365. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated:  January 23, 2023          s/ Matthew J. Sharbaugh

# CERTIFICATE OF SERVICE

I hereby certify that counsel for all parties are registered as Filing Users of the Court's CM/ECF system and that a copy of the foregoing Brief of Appellees will be served electronically on this date by operation of the Court's CM/ECF system.

Dated:  January 23, 2023            s/ Matthew J. Sharbaugh